## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

PETER D. HETTINGER AND PDH
ASSOCIATES, LLC

          Plaintiff,

   - against —

NOEL KLEINMAN, REID KLEINMAN,
and ALPHA BEAUTY DISTRIBUTORS,
INC.,

          Defendants.

Civil Action No. 08-cv-

**COMPLAINT AND JURY DEMAND**

Plaintiff Peter D. Hettinger ("Hettinger") and PDH Associates, LLC, complaining of the

defendants Noel Kleinman, Reid Kleinman, and Alpha Beauty Distributors, Inc., herein says:

### JURISDICTION AND VENUE

1.      This is an action between citizens of different states and the amount in

controversy exceeds $75,000, giving rise to  jurisdiction in this Court pursuant to 28 U.S.C.

§1332.  Venue is proper in this Judicial District because many of the acts and transactions

alleged occurred in substantial part in this District and because the defendants reside here.

### THE PARTIES

2.      Plaintiff Peter D. Hettinger ("Hettinger") is an individual who resides at 115

Catalpa Ridge Road, Pittsburgh, Pennsylvania 15238.

3.      Plaintiff PDH Associates, LLC (hereinafter "PDH") is a limited liability company

organized and existing under the laws of the Commonwealth of Pennsylvania and is

headquartered at 115 Catalpa Ridge Road, Pittsburgh, Pennsylvania 15238.

4.      Upon information and belief, Defendant Noel Kleinman ("Noel Kleinman") is an

individual who resides at 345 East 80th Street, 21C, New York, New York 10075.

5.    Upon information and belief, Defendant Reid Kleinman ("Reid Kleinman") is an individual who resides at 525 East 82nd Street, 12F, New York, New York 10028-7159.

6.    Upon information and belief, Defendant Alpha Beauty Distributors, Inc. ("Alpha Beauty") is a corporation organized and existing under the laws of the State of New Jersey with a principal place of business at 8101 Tonnelle Avenue, North Bergen, New Jersey 07047. .

## FACTS

7.    Hettinger is an executive with substantial experience in the operation of supermarket chain stores.  In or about February 2007, Hettinger began a consulting business focused upon  providing assistance to companies seeking to distribute products to grocery and drug store chains throughout the United States and Canada. Hettinger has formed PDH, a limited liability company, as the entity through which to operate his consulting business.

8.    Upon information and belief, defendants Noel Kleinman and Reid Kleinman are father and son who allegedly have been involved for some years in the wholesale sales and distribution of beauty products.

9.    Beginning in or about April 2007, Hettinger began consulting with Noel Kleinman and Reid Kleinman, helping them secure the business of various supermarket chains for the company they were operating at the time, Alpha Wholesalers, Inc. ("Alpha Wholesalers").  Alpha Wholesalers, which formerly maintained an address at 11430 Interchange Circle North, Miramar, Florida 33025, is no longer in existence, having been dissolved by defendants on or about May 15, 2008, according to records of the Florida Secretary of State, without satisfying liabilities to plaintiffs.

10.    Noel Kleinman and Reid Kleinman agreed to compensate Hettinger for his services, in part, by means of commission payments on sales to supermarket and drug store chains whose business Hettinger helped Noel Kleinman and Reid Kleinman obtain.

11.    On or about July 17, 2007, the parties entered into a written Independent Contractor Agreement ("Independent Contractor Agreement") whereby, in consideration of such timely commission payments, Hettinger agreed to consult for the purpose of marketing and selling products to supermarket and drugstore retailers. A copy of the Independent Contractor Agreement is attached as Exhibit A.   Though Alpha Wholesaler was nominally a party to the Independent Contractor Agreement, as alleged above, that entity was dissolved by defendants without satisfying its liabilities to plaintiffs.

12.    The Independent Contractor Agreement set forth in Section 5A the commission rate to be paid for business with specific retail operations procured through Hettinger's efforts.

13.    By approximately November 2007, through Hettinger's efforts, several supermarket and drugstore chains had engaged Noel Kleinman and Reid Kleinman as a supplier.

14.    On or about November 20, 2007, Noel Kleinman and Reid Kleinman informed Hettinger that they had been having "problems" with their lead investor in Alpha Wholesalers, whom they did not identify, that it would be "impossible" to continue with this investor involved in the company, and that Noel Kleinman and Reid Kleinman had to buy this investor out of the business. Noel Kleinman and Reid Kleinman sought Hettinger's help in arranging financing, including by seeking funding from members of Hettinger's family.

15.    Noel Kleinman and Reid Kleinman, on the one hand, and Hettinger, on the other, agreed that at least approximately $1.2 million in capital would be necessary for their new business venture, Alpha Beauty, to be viable during its first year of operation.

3

16.    On or about December 21, 2007, Noel Kleinman and Reid Kleinman informed Hettinger that two of their own "relatives" were ready to provide the required equity investment in Alpha Beauty. Noel Kleinman and Reid Kleinman represented that the "relatives" were individuals by the names Bebert Azran and another individual known to Azran (collectively "Azran").

17.    In a telephone call on or about January 15, 2008, Noel Kleinman and Reid Kleinman provided details of the Azran financing, stating Azran would be offered 16% of the shares in the Alpha business in exchange for a $1,000,000 investment. Noel Kleinman and Reid Kleinman continued to press Hettinger to obtain equity investors from members of his family.

18.    During this January 15, 2008 telephone call, Noel Kleinman and Reid Kleinman made the following representations about the Azran investment (the "Representations"):

a.    that Azran had "stepped up" with the bank and that, in addition to his $1,000,000 in cash, Azran had also pledged all five (5) of his businesses as security;

b.    that in exchange for the $1,000,000 in cash, Azran would receive 16% of the total outstanding shares issued by Alpha Beauty;

c.    that Azran had arranged for Merchants Bank to provide financing because Azran utilized that institution for his other businesses;

d.    that, as part of this arrangement, $500,000 of Azrans' money would remain on deposit with Merchants Bank to secure its financing of inventory and receivables;

e.    that the other $500,000 of the $1,000,000 total investment would be deposited into an Alpha Beauty operating account at Wachovia Bank; and

f.    that Azran's $1,000,000 was all cash, and not cash plus a loan or line of credit.

4

19.    Hettinger confirmed the Representations in writing to Noel Kleinman and Reid Kleinman by an email dated January 17, 2008, a copy of which is attached as Exhibit B.

20.    In reliance upon the fact that the business would be supported by the $1,000,000 Azran investment, Hettinger agreed to make a $200,000 investment of his own funds in defendants' business conditioned upon the execution of an acceptable shareholders agreement and, in the event such an agreement were not executed, immediate repayment of this amount with interest at 10% per annum.

21.    On or about January 28, 2008, Hettinger sent via an overnight service a bank check in the amount of $200,000 under cover of a January 28, 2008 letter agreement setting forth the conditions specified above. A copy of the January 28, 2008 letter and its enclosed is attached as Exhibit C.

22.    On or about January 29, 2008, Hettinger received a phone call from Noel Kleinman thanking Hettinger for the check, acknowledging and accepting the terms of the agreement enclosed with the check.

23.    Noel Kleinman and Reid Kleinman confirmed their assent to the terms and conditions of the January 28, 2008 letter by negotiating the bank check on or about January 29, 2008.

24.    On or about February 22, 2008, Hettinger discovered that Noel Kleinman and Reid Kleinman were not making timely payments to chain store customers (originated through Hettinger's efforts) of co-op advertising costs, payments which they should have been able to make had the financial position of Alpha Beauty been as they had represented to Hettinger. Hettinger questioned Noel Kleinman and Reid Kleinman why they were not making timely payments to customers.  Only then did Noel Kleinman and Reid Kleinman reveal that the Azran

investment was not $1,000,000, as they had represented and Hettinger had confirmed in writing, but rather was only half that amount, $500,000, and that defendants had lied to him intentionally in order to induce him to invest his own money in the business.

25.     Thus, the Representations. which were made to Hettinger specifically to induce his investment in the company, were knowingly false and were made with full knowledge of the true facts about the amount of the Azran investment.

26.     Upon learning that he had been lied to Noel Kleinman and Reid Kleinman, Hettinger made written demand for repayment of the $200,000, but those demands have been ignored.

### FIRST CLAIM FOR RELIEF
### (Breach Of Contract-$200,000 Loan)

27.     Plaintiffs incorporate by reference all prior allegations of this Complaint with the same force and effect as if fully set forth herein at length.

28.     In accordance with the parties' agreement as embodied in the January 28, 2008 letter (Exhibit C), there is due and payable by defendants to plaintiffs the amount of $200,000 plus interest at 10% per annum.

29.     Defendants have failed and refused to repay this amount, which is now due and owing, plus interest, costs and attorneys' fees.

### SECOND CLAIM FOR RELIEF
### (Fraud)

30.     Plaintiffs incorporate by reference all prior allegations of this Complaint with the same force and effect as if fully set forth herein at length.

31.     Defendants knowingly misrepresented and concealed from Hettinger the fact that the Azran investment was only $500,000 and not $1,000,000 as set forth in the Representations.

32.    The investment of $1,000,000 by Azran was a material fact in plaintiffs decision to invest in defendants' business because the business required at least this amount of capital to operate.

33.    Defendants knew and intended, or reasonably should have known, that plaintiffs would rely upon their Representations and omissions as alleged above.

34.    Plaintiffs reasonably relied upon the Representations and material omissions as alleged above in that plaintiffs would not have invested $200,000 with defendants if the true facts about the Azran investment had been disclosed.

35.    Defendants have pursued a course of conduct in which they have knowingly and/or recklessly engaged in acts that have operated as a fraud upon plaintiffs.

36.    As a direct, proximate and foreseeable result of the aforesaid misrepresentations and omissions, plaintiffs have been, and continue to be, damaged in the amount to be proven at trial but believed to exceed $250,000.

### THIRD CLAIM FOR RELIEF
### (Violation of 43 Pa. Stat. § 1471 et. seq.)

37.    Plaintiffs incorporate by reference all prior allegations of this Complaint with the same force and effect as if fully set forth herein at length.

38.    Because the Independent Contractor Agreement called upon Hettinger and PDH to serve as a wholesale sales representative for defendants, the relationship between them was governed by the Pennsylvania Commissioned Sales Representatives Act, 43 Pa. Stat. § 1471 et. seq.

39.    Pursuant to the 2007 Independent Contractor Agreement, Hettinger regularly and actively canvassed the trade and solicited sales of defendants' products on behalf of defendants

7

and for their benefit in consideration of certain commission monies to be paid by defendants to plaintiffs.

40.    Defendants have failed and refused to make commission payments due to Hettinger.

41.    Despite defendants' failure to provide sales records to Hettinger as required by the 2007 Independent Contractor Agreement, plaintiff estimates that an amount in excess of $52,000 in commissions was due to Hettinger as of May 31, 2008, and this amount continues to increase as additional sales are made to accounts introduced by Hettinger.

42.    Defendants have willfully failed to promptly pay contractually obligated commissions fees and reimbursable expenses pertaining to the Independent Contractor Agreement as required by 43 Pa. Stat. § 1471 et. seq.

43.    As a result of defendants' willful failure to promptly pay contractually obligated commissions fees and reimbursable expenses, plaintiffs have suffered damages in the amount to be proven at trial from unpaid and past due commission fees and reimbursable expenses pertaining to the Agreement, such amount to be doubled in accordance with the statute, together with attorneys fees and costs in accordance with the statute.

### FOURTH CLAIM FOR RELIEF
**(Violation of New York Labor Law § 191-a et. seq.)**

44.    Plaintiffs incorporate by reference all prior allegations of this Complaint with the same force and effect as if fully set forth herein at length.

45.    Defendants have willfully failed to promptly pay contractually obligated commissions fees and reimbursable expenses pertaining to the Independent Contractor Agreement as required by New York Labor Law § 191-a et. seq.

46.    As a result of defendants' willful failure to promptly pay contractually obligated commissions fees and reimbursable expenses, plaintiffs have suffered damages in the amount to be proven at trial from unpaid and past due commission fees and reimbursable expenses pertaining to the Agreement, such amount to be doubled in accordance with the statute, together with attorneys fees and costs in accordance with the statute.

### FIFTH CLAIM FOR RELIEF
### (Breach Of Contract-Commissions)

47.    Plaintiffs incorporate by reference all prior allegations of this Complaint with the same force and effect as if fully set forth herein at length.

48.    Plaintiffs performed in accordance with the understanding and agreement reached with defendants, and have fully complied with all of the contractual obligations imposed upon them under the agreement with defendants.

49.    Defendants have breached the agreement with plaintiffs by failing to provide fully commissions due to him from the commencement of their relationship to the present.

50.    Plaintiffs now seek compensatory damages for defendants' breach of contract, as well as payment of all outstanding commissions and other amounts.

51.    Despite defendants' failure to provide sales records to Hettinger as required by the 2007 Independent Contractor Agreement, plaintiff estimates that an amount in excess of $52,000 in commissions was due to Hettinger as of May 31, 2008, and this amount continues to increase as additional sales are made to accounts introduced by Hettinger.

52.    Plaintiffs have suffered damages in the amount to be proven at trial from unpaid and past due commission fees and reimbursable expenses pertaining to the Agreement, plus costs, interest and attorneys fees.

## SIXTH CLAIM FOR RELIEF
### (Breach Of Implied Covenant Of Good Faith And Fair Dealing)

53.    Plaintiffs incorporate by reference all prior allegations of this Complaint with the same force and effect as if fully set forth herein at length.

54.    The agreements among plaintiffs, on the one hand, and defendants, on the other hand, contain an implied covenant of good faith and fair dealing which requires them to act fairly in all its dealings and to refrain from frustrating Hettinger's reasonable expectations under such agreements.

55.    The acts and omissions of defendants, as alleged herein, constitute a breach of said implied covenant of good faith and fair dealing.

56.    As a direct, proximate and foreseeable result of the aforesaid breach of the implied covenant of good faith and fair dealing, Hettinger has been, and continues to be, damaged in the amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF
### (Unjust Enrichment)

57.    Plaintiffs incorporate by reference all prior allegations of this Complaint with the same force and effect as if fully set forth herein at length.

58.    By their actions in retaining monies which should have been paid to plaintiffs, defendants have unjustly enriched themselves at plaintiffs' expense.

59.    Equity and good conscience dictate that defendants not be permitted to retain the profits from their actions.

60.    Plaintiffs have been and continue to be damaged by defendants above-stated activities and conduct.  Defendants have profited thereby and, as a result, defendants are liable to

plaintiffs for compensatory damages, in the amount to be determined at trial, together with attorneys fees, costs, and interest.

61.    By reason of the foregoing, Hettinger has been damaged the amount to be proven at trial.

## EIGHTH CLAIM FOR RELIEF
### (Accounting)

62.    Plaintiffs incorporate by reference all prior allegations of this Complaint with the same force and effect as if fully set forth herein at length.

63.    Absent an accounting, Hettinger has no adequate remedy at law.

## NINTH CLAIM FOR RELIEF
### (Negligent Misrepresentation)

64.    Plaintiffs incorporate by reference all prior allegations of this Complaint with the same force and effect as if fully set forth herein at length.

65.    Based upon the relationship of the parties, and the special knowledge of plaintiffs as alleged above, plaintiffs had a duty to exercise reasonable care in disclosing correct information to defendants concerning the Azran investment and the false and misleading information in the Representations.

66.    Defendants failed to exercise their duty of reasonable care when they made the Representations to plaintiffs.

67.    Plaintiffs justifiably relied upon the Representations and suffered damages as a result.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment against all defendants as follows:

1.    As to the First Claim for Relief (breach of promise to repay $200,000),

    a.  For the amount of $200,000 plus interest at 10% per annum from April 8, 2008;

    b.  For the reasonable costs of the suit as provided by law;

    c.  For reasonable attorney's fees as provided by law; and

    d.  For such other and further relief as the Court may deem just and proper.

2.     As to the Second Claim for Relief (fraud)

    a.  For plaintiffs' compensatory damages in the amount as proven at trial but believed to exceed $250,000;

    b.  For exemplary and punitive damages;

    c.  For the reasonable costs of the suit as provided by law;

    d.  For reasonable attorney's fees as provided by law; and

    e.  For such other and further relief as the Court may deem just and proper.

3.     As to the Third Claim for Relief (43 Pa. Civ. Code Stat. § 1471 et. seq.):

    a.  For actual damages in the amount to be proven at trial;

    b.  For double damages as provided for under 43 Pa. Civ. Code Stat. § 1471 et. seq.

    c.  For the reasonable costs of the suit as provided by 43 Pa. Civ. Code Stat. § 1471 et. seq.

    d.  For reasonable attorney's fees as provided by 43 Pa. Civ. Code Stat. § 1471 et. seq.

    e.  For such other and further relief as the Court may deem just and proper.

3.     As to the Fourth Claim for Relief (New York Labor Law § 191-a et. seq.):

    a.  For actual damages in the amount to be proven at trial;

    b.  For double damages as provided for under New York Labor Law § 191-c(3).

    c.  For the reasonable costs of the suit as provided by New York Labor Law § 191-c(3);

    d.  For reasonable attorney's fees as provided by New York Labor Law § 191-c(3); and

    e.  For such other and further relief as the Court may deem just and proper.

4.    As to the Fifth, Sixth and Seventh Causes of Action (Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing and Unjust Enrichment):

    a.  For actual damages in the amount to be proven at trial, plus interest at the rate of 10% per annum;

    b.  For all foreseeable incidental and consequential damages;

    c.  For the reasonable costs of the suit as provided by law;

    d.  For reasonable attorney's fees as provided by law; and

    e.  For such other and further relief as the Court may deem just and proper.

6.    As to the Eighth Claim for Relief (Equitable Accounting):

    a.  For judgment that defendants account to plaintiffs for all money received by defendants and due and owing to plaintiffs for commissions and other amounts due;

    b.  For judgment against defendants for any sum or balance found to be due to plaintiffs.

    c. For all foreseeable incidental and consequential damages in the amount as may be proven at trial;

    d. For the reasonable costs of the suit as provided by law;

    e. For reasonable attorney's fees as provided by law; and

    f. For such other and further relief as the Court may deem just and proper.

7. As to the Ninth Claim for Relief (Negligent Misrepresentation):

    a. For the amount of $200,000 plus interest at 10% per annum from April 8, 2008;

    b. For all foreseeable incidental and consequential damages relating to the breaches of the Contract in the amount as may be proven at trial;

    c. For the reasonable costs of the suit as provided by law;

    d. For reasonable attorney's fees as provided by law; and

    e. For such other and further relief as the Court may deem just and proper.

New York, New York
Dated: July 18, 2008

CONNELL FOLEY LLP

By: _____
    Peter J. Pizzi
85 Livingston Avenue
Roseland, NJ 07068
Tel: (973) 533-4221
Facsimile: (973) 535-9217

Attorneys for Plaintiff Peter D. Hettinger and PDH Associates, Inc.

## DEMAND FOR JURY

Plaintiffs demand a trial by jury on all claims so triable.

# EXHIBIT A

## INDEPENDENT CONTRACTOR AGREEMENT

This Agreement is made this ...*17th*... day of ...*July*..., 2007, by and between Alpha Group, Inc. d/b/a Alpha Beauty, a Florida corporation with offices at 11430 Interchange Circle North, Miramar, Florida 33025 ("Alpha" or "Corporation") and PDH Associates, LLC, a Pennsylvania limited liability company with offices at 115 Catalpa Ridge Road, Pittsburgh, PA 15238 ("PDH" or "Sales Agent").

### RECITALS

A.    Alpha is in the business of selling professional hair care products, professional nail care and products and professional skin care products.

B.    PDH represents and warrants that it is capable of marketing and selling those products regularly sold by Alpha and PDH desires to act as an independent contractor, as a Sales Agent for Alpha, to perform services as a sales agent to the satisfaction of Alpha, subject to the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the mutual covenants and conditions of this Agreement, the parties agree as follows:

1.    Engagement.

Alpha hereby engages PDH for the purpose of marketing and selling those products regularly sold by Alpha.  PDH hereby accepts such engagement subject to the terms and conditions of this Agreement.

2.    Independent Contractor Status.

PDH expressly acknowledges and agrees that it will be acting as an independent contractor and not as an employee, for all purposes, including payment of its own Social Security taxes, and all of its own federal, state and local taxes including income taxes.

1

Except for the very limited purposes set forth elsewhere herein, Alpha will have no ability to control the hours and terms and conditions of PDH's work or the manner in which it performs its services for Alpha.

Excluding "competing companies" and "conflicting products" as defined in Section 7 below,  PDH is free to perform services for other PDH clients and/or pursue other business activities, so long as he is not in violation of Section 8 of this Agreement.

3.    Term.

This Agreement shall commence on the date hereof, and unless sooner terminated as provided herein, shall expire five (5) years from the date hereof, unless extended in writing by both parties.

4.    Performance of Sales Agent.

A.    All services and work performed by PDH hereunder shall be of the highest professional standards and shall be performed to Alpha's reasonable satisfaction;

B.    PDH shall complete and submit to Alpha all usual, customary and/or necessary presentation materials, analyses and other relevant documents, as are reasonably required by  Alpha, in a timely manner, related to the sale of the products sold by Alpha;

C.    PDH shall use its best efforts to maintain and increase the goodwill and reputation of Alpha;

D.    PDH shall perform such other and further duties as Alpha may reasonably request from time to time, and shall be paid for his services in that regard, in a time and manner as the parties shall mutually agree.

5.    Commissions.

2

A.    PDH shall be paid commissions at the rate of three (3%) percent of net

paid invoices, for products sold as a direct result of and procured through PDH's efforts

with specific retail operations during the term of this Agreement. To eliminate any

possible confusion, the parties shall develop a Schedule of businesses which have been

procured by PDH or in part by PDH, and from time to time shall alter such Schedule as is

reasonable under all the circumstances. Schedule of businesses and entities to be

separately attached and agreed upon.

"Net paid invoice" shall equal the net amount of a paid invoice, calculated as

gross sales minus cash discounts, returns and damages. Commissions shall be paid to

PDH within 15 calendar days immediately following the end of the month in which

payment of invoices is received by Alpha.

B.    Commissions shall be paid for as long as Alpha and/or Noel Kleinman

and/or Reid Kleinman continue to do business with any of the specific retail operations

PDH helped to establish as customers, even if the terms of this relationship have expired

after the initial five-year term of this Agreement. In the event of acquisition or

consolidation among any of the customers, PDH will still continue to be paid for that

portion of the business which PDH helped to establish. In the event that a customer

established by PDH acquired another retailer, if the customer established by PDH

performs the buying function and new business results from the acquired customer, PDH

will be entitled to commissions on that business as well.

C.    In the event that Alpha and/or Noel Kleinman and/or Reid Kleinman sells

the business or takes it public, or merges with another business, the new owners and

management will continue to pay Sales Agent for services previously rendered, or will offer a prepayment package which recognizes the income loss to PDH.

D.    Sales Agent agrees not to present a sales program to a customer without Alpha's prior approval, and Alpha agrees not to withhold unreasonably its approval.

E.    Alpha shall have the absolute right, in its sole discretion, to pay to PDH, an advance on account of commissions anticipated to be due, in an amount not greater than one-half (1/2) of what Alpha reasonably anticipates will be the commission ultimately due to PDH for current orders actually received and shipped.  Such advice shall be adjusted upon calculation of actual commissions due to PDH.

F.    The obligation of Alpha pursuant to Section 5 shall survive the expiration or termination of this agreement.

6.    Expenses.

PDH is authorized to incur only those expenses for meetings, trade shows and sales calls that Alpha deems reasonable and appropriate and for which Alpha gives prior approval.  Alpha will reimburse PDH for such expenses upon PDH's presentation of receipts and an itemized accounting therefore.

7.    Confidential Information.

A.    "Confidential Information" means information disclosed to PDH or known by PDH as a consequence of or through its actions as a Sales Agent of Alpha, including but not limited to Alpha's financial affairs, business records and plans, financial statements, trade secrets, customers, customer lists and records, products, suppliers, processes and services, inventions, product design information, pricing structure, discounts, costs, computer programs and listings, source codes and/or object codes,

4

copyrights and other intellectual property, other proprietary information and information relating to projects, proposals, manufacture, purchasing, accounting, engineering, marketing, merchandising and sales. "Confidential Information" does not include matters of public knowledge and any other information that both parties agree in writing is not confidential.

B.     "Competing Company" means any person, partnership, firm, joint venture, company, corporation or organization engaged in, or about to become engaged in, any business in direct competition with the business of Alpha, as referred to in the "Recitals" section of this Agreement.

C.     "Conflicting Product" means any product, process or service of any person or organization other than Alpha, in existence or under development, which resembles or competes with a product, process or service which is sold by Alpha prior to the termination of this Agreement or about which PDH acquires Confidential Information.

8.     <u>Confidentiality.</u>

A.     Except as required by its duties to Alpha or for consultation with its attorneys or accountants, PDH will not, during the term of this Agreement or for two (2) years after the termination of this Agreement, regardless of the time, manner, or cause (or lack of cause) of the termination, directly or indirectly, disclose or reveal to any person or entity or otherwise make use of any Confidential Information or disseminate, lecture upon or publish anything concerning any Confidential Information.

B.     Upon the termination of this Agreement, regardless of the time, manner or cause (or lack of cause) of the termination, all documents, records, notebooks and similar repositories of or containing Confidential Information, computerized or otherwise,

including all copies thereof, then in PDH's possession, whether prepared by it or others, will be delivered to Alpha.

     C.    This Agreement shall be governed for all purposes by the laws of the State of Florida.  If any portion of this Agreement is held to be unreasonable, arbitrary against public policy or otherwise unenforceable, this Agreement shall be considered divisible, as to paragraphs, portions of paragraphs, time and geographical area.

    9.    <u>Indemnification.</u>

Alpha agrees to hold PDH harmless, indemnify and defend PDH from any claims made by consumers, regulatory agencies, retailers, suppliers and/or manufacturers of the products sold by Alpha.

    10.    <u>Arbitration.</u>

Alpha and PDH agree that any dispute concerning the construction or interpretation of this Agreement or the alleged breach of this Agreement shall be submitted to arbitration, in the State of Florida, in accordance with procedures similar to the rules and requirements of the American Arbitration Association then in effect.  The parties shall not be required to use the services of the American Arbitration Association, but shall make a good faith effort to engage the services of an arbitrator or arbitration panel which will provide an expeditious and moderately inexpensive process.  In such event, each party shall be responsible for its own costs, attorneys' fees and expenses incurred in such arbitration proceeding.

    11.    <u>Binding Effect; Assignment.</u>

This Agreement shall be binding upon the parties herein and upon their respective personal representatives, executors, administrators, legal representatives, successors and

6

assigns. However, PDH may not assign this Agreement or its duties or obligations under it to another party without the written consent of Alpha.

IN WITNESS WHEREOF, we hereby set our hands and seals as of the date first above written.

Alpha Group, Inc.
d/b/a Alpha Beauty

By: _____
Reed Weinman

PDH Associates, LLC

By: _____
Peter D. Hettinger

# ALPHA BEAUTY/PDH ASSOCIATES, LLC
## SCHEDULE OF BUSINESSES OR ENTITIES

The following retailers are to be considered retailers that were in total or partially assisted by PDH Associates, LLC:

Costco Mexico
Wal-Mart Canada
Lewis Drug
Price Chopper
Bi-Lo, LLC
Davidson Drugstores
Giant Eagle, Inc.
Drug Fair Group, Inc.
Winn Dixie Stores, Inc.
Hudson's Bay Company
London Drugs Limited
Navarro Discount Pharmacies
Chain Drug Consortium, LLC
Meijer, Inc.
Kerr Drug, Inc.
Publix

# EXHIBIT B

| | |
|---|---|
| **From:** | PETER HETTINGER [peterhettinger@yahoo.com] |
| **Sent:** | Thursday, January 17, 2008 7:15 PM |
| **To:** | Reid Kleinman; Noel Kleinman |
| **Subject:** | Fwd: Alpha Beauty Adjustments - One Last Time |
| **Attachments:** | Alpha Beauty Adjustments - One Last Time |

Please look this over and let me know if I mis-stated anything?

Thanks and great job today - we owe Beber in a big way for stepping up!

Peter

Note: forwarded message attached.

**From:**    PETER HETTINGER [peterhettinger@yahoo.com]
**Sent:**    Thursday, January 17, 2008 7:14 PM
**To:**    Jon Hettinger
**Subject:** Alpha Beauty Adjustments - One Last Time

Dad,

Here is my understanding of the situation as a result of the meeting today with Merchants.  These adjustments are in addition to the A/R adjustments based on the weighted averages I gave you yesterday.

1.  Please eliminate the Florida Retail Supervisor from the numbers for now in all years.
2.  Please eliminate the repairs and maintenance line - as this was added before we decided to go into a public warehouse facility - these expense are included in the warehouse services line of 3%
3.  Please eliminate the miscellaneous line of the budgets
4.  Please reduce year one salaries for the three partners to $12,500 each per month, Rory should be plugged in at $5,000 per month and $6,000 per month should be added for clerical and accounting support.  Total per month year one for salaries should be $48,500.
5.  A Principal Sales Commission line should be added in and be flat-lined at $36,000 per month
6.  The promo account for year one should be adjusted to 1.5%

Here is my understanding of the financing situation:

1.  Beber ponied up to the table in a big way.  He is placing $1 million of his money into the deal in exchange for 16% of the shares of the company.  Beber also authorized a lien against his five other businesses.  He is also personally guaranteeing the business with Merchants.
2.  Noel and Reid also have signed personal guarantees leveraged against the homes in Manahattan.
3.  The group is looking for $500,000 between investors I can pull in (myself, Dick?).
4.  $500,000 of Beber's money will remain in an interest bearing account at Merchants - this will serve as the security for Merchants to offer us a revolving line of credit to cover our needs for the first couple of years.  AT a rate of prime + 2%
5.  $1 million of the equity will be parked with Wachovia and will be used to cover off the first several months of slotting and clean up fees and expenses.
6.  With Beber stepping up to the plate, Merchants will front us 100% of the inventory we are buying in the buyout (by the way, the Bi-Lo order was $560K not the $650K we expected).  They will also cover 100% of the purchase orders for customers - those are the only POs we will create so essentially, they are covering all inventory at 85% of our selling prices which is adequate to cover our cost.
7.  Again, with Beber stepping up, Merchants will also cover 100% of our Accounts Receivable minus the anticipated and budgeted slotting payments which they understand will be deducted.
8.  Prime + 2% is the rate for the debt.
9.  The company is going to be a Subchapter S Corp in NJ which I guess has a ton of tax benefits (no state tax, etc., etc.) the accounting firm Merchants wants us to use will fill us in on that after they review the financial statements we are working here on revising.

I believe this covers everything - call me with any questions you might have.

Thanks,

Peter

# **EXHIBIT C**

Mr. Noel Kleinman
President
Alpha Beauty Distributors, Inc.
345 East 80th Street
Suite 21C
New York, New York 10075

January 28, 2008

Noel,

Enclosed is a bank check for $200,000.00 for a minimum equity position totaling 3.2% of the total outstanding shares to be issued for Alpha Beauty Distributors, Inc. The 3.2% equity stake reflects the current value of the investment based on what the other primary equity investor has committed to. If, the additional equity investors participating in raising the first $2.5 million require a larger stake in the company, this investment will be treated proportionally and the equity stake value will adjust only upward to be consistent with other investor's equity investment requirements. This investment is to be treated on a consistent basis with the other equity investors involved in raising the first $2.5 million in equity and will not be reduced in value below the 3.2% equity stake position in total outstanding shares issued for Alpha Beauty Distributors, Inc. The shares should be issued to Peter D. and Michelle L. Hettinger.

These monies are being invested prior to my agreement on an "Operating Agreement" that will serve to govern how the business is to be operated which your attorney is in the process of preparing and I will have my counsel review. The monies are being invested prior to an acceptable "Operating Agreement" being agreed to only to protect the established customers of Alpha Beauty that are currently owed monies (BI-LO, LLC and Bruno's Supermarkets). It is understood that the "Operating Agreement" will outline traditional checks and balances to protect assets, contain employment provisions for partners with salary caps and provisions, have clearly spelled out procedures to prevent a divorcing spouse from forcing the sale of the business, etc.

By endorsing and depositing this check, you acknowledge and agree to all of the investment requirements stated in this letter above and agree that if we do not reach agreement on an "Operating Agreement" with acceptable terms, the full investment of $200,000.00 plus 10% annual interest must be returned immediately upon request. Please sign and date this letter below where indicated to further accept the terms of this investment and return a copy to me at your earliest convenience.

Regards,

Peter D. Hettinger
115 Catalpa Ridge Road
Pittsburgh, PA 15238


Noel Kleinman
President
Alpha Beauty Distributors, Inc.

No. 6295103

8-9/430

**PNCBANK**
PNC Bank, National Association
Pittsburgh, Pennsylvania

CASHIER'S CHECK

DATE  JANUARY 29, 2008

PAY TO THE
ORDER OF  ALPHA BEAUTY DISTRIBUTORS INC

TWO HUNDRED THOUSAND AND 00 / 100************************************** DOLLARS

$  200,000.00

PETER D HETTINGER

REMITTER

PNC Bank, National Association

Daniel R. Little

OFFICIAL SIGNATURE

MP

FORM 107347-0706
0019.0098-6

⑆6295103⑆ ⑆043000096⑆ 0000902020011⑈

**EXPRESS MAIL**

UNITED STATES POSTAL SERVICE®

Post Office To Addressee

Customer Copy
Label 11-B, March 2004

**DELIVERY (POSTAL USE ONLY)**

Delivery Attempt
Mo.    Day    Time    ☐ AM    ☐ PM
Employee Signature

Delivery Attempt
Mo.    Day    Time    ☐ AM    ☐ PM
Employee Signature

Delivery Date
Mo.    Day    Time    ☐ AM    ☐ PM
Employee Signature

**WAIVER OF SIGNATURE** (Domestic Mail Only)
Additional merchandise insurance is void if customer requests waiver of signature. I wish delivery to be made without obtaining signature of addressee or addressee's agent (if delivery employee judges that article can be left in secure location) and I authorize that delivery employee's signature constitutes valid proof of delivery.

**NO DELIVERY**
☐ Weekend    ☐ Holiday

Mailer Signature

**CUSTOMER USE ONLY**

PAYMENT BY ACCOUNT
Express Mail Corporate Acct. No.

Federal Agency Acct. No. or
Postal Service Acct. No.

TO: (PLEASE PRINT)    PHONE ( 917 ) 972-6037

NOEL KLETMAN
345 EAST 80TH STREET
# 21C
NEW YORK, NEW YORK

ZIP + 4 (U.S. ADDRESSES ONLY. DO NOT USE FOR FOREIGN POSTAL CODES.)

1 0 0 7 5

FOR INTERNATIONAL DESTINATIONS, WRITE COUNTRY NAME BELOW.

---

**ORIGIN (POSTAL SERVICE USE ONLY)**

PO ZIP Code

Date Accepted
Mo.    Day    Year

Time Accepted    ☐ AM    ☐ PM

Flat Rate ☐ or Weight
lbs.    oz.

Day of Delivery
☐ Next    ☐ 2nd    ☐ 2nd Del. Day

Scheduled Date of Delivery
Month    Day

Scheduled Time of Delivery
☐ Noon    ☐ 3 PM

Military
☐ 2nd Day    ☐ 3rd Day

Int'l Alpha Country Code

Postage    $

Return Receipt Fee

COD Fee

Insurance Fee
$

Total Postage & Fees
$

Acceptance Emp. Initials

FROM: (PLEASE PRINT)    PHONE (412) 779-3795

FRANK D. HETTINGER
115 CATALPA FARMS ROAD
PITTSBURGH, PA 15238

FOR PICKUP OR TRACKING
Visit WWW.USPS.COM
Call 1-800-222-1811

EB 971396289 US