```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

PETER D. HETTINGER, et al.,            :

                    Plaintiffs,        :    08 Civ. 6466 (HBP)

      -against-                        :    OPINION
                                            AND ORDER
NOEL KLEINMAN, et al.,                 :

                    Defendants.        :

----------------------------------X
```

PITMAN, United States Magistrate Judge:

## I.   Introduction

This action arises out of plaintiffs' sales for and investment in defendants' failed business venture.  Plaintiffs seek unpaid commissions pursuant to an alleged agreement among plaintiff PDH Associates, LLC and defendants Noel and Reid Kleinman.  Plaintiffs also seek the return of amounts Hettinger invested in Alpha Beauty Distributors, Inc. alleging that defendants are guilty of fraud and breach of contract.

The parties consented to my exercising plenary jurisdiction over this matter pursuant to 28 U.S.C. § 636(c), and the matter was tried before me, without a jury, on January 25 through 27, 2010.  Based on the testimony and other evidence offered at trial and the parties' pre- and post-trial submissions, I make the following findings of fact and conclusions of law.

II.   Findings of Fact

    A.   The Parties and
        Their Relationship

    1.   Plaintiff, Peter Hettinger, is a resident and citizen of Pennsylvania (Joint Pre-Trial Order at ¶ 1; Supplement to Joint Pretrial Order at ¶ a(1)).

    2.   Hettinger is the sole member of PDH Associates, LLC ("PDH"), a limited liability company with a principal place of business in Pittsburgh, Pennsylvania (Supplement to Joint Pre-trial Order at ¶¶ a (2)-(3)).   PDH was formed on June 20, 2008 (Tr.[1] 134:6-8, 242:25-243:17).

    3.   Defendants Noel and Reid Kleinman reside in and are citizens of New York (Joint Pre-Trial Order at ¶ 1; Supplement to Joint Pretrial Order at ¶¶ a(4)-(5)).   Noel Kleinman is Reid Kleinman's father (Tr. 16:25-17:2).

    4.   Defendant Alpha Beauty Distributors, Inc., ("Alpha Beauty Distributors"), is a New Jersey corporation formed by Reid Kleinman on January 8, 2008 (Supplement to Joint Pretrial Order at ¶ a(11)).

    5.   Hettinger became acquainted with the Kleinmans in the late 1990s when he was the manager of health and beauty care

---

[1]"Tr." refers to the trial transcript.   "Dep.," preceded by a name, refers to the transcript of the deposition of the witness identified in the citation.   "PX" and "DX" refer to plaintiffs' exhibits and defendants' exhibits, respectively.

for the Stop & Shop supermarket chains (Tr. 7:7-8:17, 145:19-23, 380:23-381:4).  A buyer for Stop & Shop who had met the Kleinmans at a trade show introduced them to Hettinger (Tr. 9:13-16; 146:19-147:5; 380:23-381:4).

6.   The Kleinmans sold "professional hair care prod-ucts," i.e., hair care products that are generally made for hair salons, to grocery stores and pharmacies (Tr. 8:18-9:5, 379:17-23).  At that time the Kleinmans sold products for Belco Distrib-utors (Tr. 9:22-24).  All commissions that the Kleinmans earned from Belco were paid to Allstate Beauty Products, a corporation formed by the Kleinmans (Tr. 378:8-24).

7.   Soon after Hettinger met the Kleinmans, Stop & Shop began buying from Belco (Tr. 9:13-16; 147:24-148:2).

8.   After he left Stop & Shop in 2005, Hettinger used or recommended the Kleinmans to Meijer, Inc. and Giant Eagle, two other supermarket chains where he was employed (Tr. 10:13-17; 12:13-20; 15:11-17; 150:3-12).  Hettinger left Giant Eagle in December 2006 (14:21-24).

B.   The Independent
     Contractor Agreement

9.   In approximately April 2007, Hettinger and the Kleinmans began to discuss the prospect of Hettinger selling for a company that the Kleinmans were forming (Tr. 16:10-24, 390:1-14).

3

10.   On July 17, 2007, Hettinger, on behalf of PDH and the Kleinmans, on behalf of Alpha Group, Inc., ("Alpha Group"), d/b/a Alpha Beauty signed a document entitled "Independent Contractor Agreement" whereby PDH would act as a sales agent to Alpha Group in exchange for three percent of "net paid invoices, for products sold . . . through PDH's efforts . . ." (Supplement to Joint Pretrial Order ¶ a(9); PX 1).

11.   Alpha Group was incorporated in Florida in January 2006 by Raimondas Talentas (PX 2).  According to Noel Kleinman, Alpha Group was a company based in Florida that distributed professional hair care and other products to wholesalers (Tr. 514:25-516:3).

12.   There is no evidence in the record that Alpha Beauty is registered as a fictitious name for Alpha Group.

13.   In May 2007, Noel Kleinman incorporated Alpha Wholesalers, Inc., ("Alpha Wholesalers"), (Tr. 384:15-22; PX 29). According to Noel Kleinman, Alpha Wholesalers was formed because Manny Daskos, the owner of Alpha Group wanted to create a sepa-rate business that sold hair care products to retailers, as opposed to other wholesalers (Tr. 386:19-387:8).

14.   Alpha Beauty is registered as a fictitious name for Alpha Wholesalers (PX 29).

15.   As of July 2007, the Kleinmans referred to the entity on whose behalf they signed as "the Florida business" and

represented to Hettinger that they each owned 40% of such a business (Tr. 25:14-26:22).

      16.  Noel Kleinman testified that he and his son began to work with Alpha Group in March or April of 2007, that he became the President of Sales of Alpha Group and that he and his son owned approximately four percent of the company's shares (Tr. 383:10-11, 385:1-386:1-3).  He also testified that he was authorized by Alpha Group to enter into the Independent Contractor Agreement on its behalf (Tr. 391:2-4).  At his deposition, however, he testified that although he thought that Alpha Group was a part of Alpha Wholesalers and that Alpha Group, d/b/a Alpha Beauty "had to do with" Alpha Wholesalers, he "never had any responsibility for" Alpha Group, had no affiliation with Alpha Group, and to his knowledge "was never authorized to do or engage in any business transactions on behalf of" Alpha Group (Noel Kleinman Dep. 14:24-16:12, 32:16-19).  Noel Kleinman acknowledged at trial that he had given this testimony (Tr. 428:13-24, 429:14-23, 432:19-25).  Based on his demeanor at trial, this inconsistent testimony and the lack of any other evidence that Noel Kleinman was authorized to enter into the Independent Contractor Agreement, I credit Noel Kleinman's earlier testimony and find that he was not authorized to enter into the Independent Contractor Agreement on behalf of Alpha Group.

17.   Reid Kleinman testified at trial that he and his father were associated with Alpha Group (Tr. 514:25-515:3) but upon being shown the certificate of incorporation for Alpha Group, testified that he had no authority to act on behalf on such an entity (Tr. 541:10-21).  At his deposition, Reid Kleinman testified that he knew he was not associated with Alpha Group because he did not recognize the name of the incorporator or the address listed on Alpha Group's certificate of incorporation (Reid Kleinman Dep. 23:8-24:13).  The Kleinmans argue that Reid Kleinman cannot be expected to recognize the incorporator or address of Alpha Group because he did not become associated with Alpha Group until 2007 and "was not an authority on Alpha Group" (Defendants Noel Kleinman's and Reid Kleinman's Proposed Findings of Fact and Conclusions of Law, ("Kleinmans' Post-Trial Mem."), at Findings of Fact ¶ 27).  Nevertheless, given the absence of any evidence that Reid Kleinman had authority to contract on behalf of any entity called Alpha Group, I find that he had no authority to enter into the Independent Contractor Agreement.

18.   After the agreement was signed, Hettinger initially made sales for Alpha Wholesalers (Tr. 24:20-25:13, 26:25-27:10, 391:21-392:3).  Although, under the agreement, Hettinger was to act as a sales agent for Alpha Group, Hettinger discovered after commencing this action that he did not actually sell products for Alpha Group (Tr. 20:12-16).  Indeed, Noel Kleinman

6

testified that Hettinger actually sold for Alpha Wholesalers from the date of the Independent Contractor Agreement until approximately December 2007 (Tr. 391:13- 392:1).  After Alpha Beauty Distributors was incorporated on January 8, 2008 Hettinger sold products for Alpha Beauty Distributors until June 20, 2008 (Tr. 256:20-257:2, PX 118, 119).

19.  When making sales, the Kleinmans and Hettinger represented themselves at all times as acting on behalf of Alpha Beauty (Tr. 99:16-23).

20.  On May 14, 2008, at Hettinger's request, Reid Kleinman sent Hettinger a spreadsheet showing that Hettinger had helped procure a total of $1,192,586.53 in sales as of that date (Tr. 91:13-92:25; PX 4,5,37).

21.  Hettinger responded that the figure did not reflect all amounts purchased by the distributor C&S from Alpha Wholesalers, and was $827,687.34 short (Tr. 95:20-96:9, 97:18-98:9; PX 6).

22.  Based on those adjusted sales figures, Hettinger contends that his total sales as of May 2008 were $2,020,273.86 and the total amount due to him under the Independent Contractor Agreement was $60,608.21 (Tr. 97:20-98:13; PX 6).

23.  Hettinger testified that approximately $827,000 of the sales on which he earned commissions were through Alpha Wholesalers and the remainder were through Alpha Beauty Distribu-

tors (Tr. 255:25-257:2).  $2,020,273.86 less $827,000 equals $1,193,273.86.

24.  Hettinger was paid $10,000 by Alpha Beauty Distributors in commissions (Supplement to the Pretrial order ¶ a(12)-(13)).

C. Alpha Beauty Distributors
   and the Letter Agreement

25.  In November 2007, the Kleinmans told Hettinger that they wanted to buy out what they had referred to as the "Florida Company" and form a new entity in New Jersey and asked for Hettinger's advice regarding the terms of the agreement (Tr. 27:11-28:22).  By December 2007 and at the Kleinmans' request, Hettinger was creating financial projections for the new company (Tr. 29:20-32:8; PX 8, 9 and 15).

26.  To assist in preparing these projections, the Kleinmans provided Hettinger with information about past sales by Alpha Wholesalers, told him which suppliers they would be able to do business with and when, how much these suppliers sold and what costs the new company could expect to incur (Tr. 30:7-21, 447:2-12).  The Kleinmans also told Hettinger that they anticipated sales at thirty-two or thirty-three percent profit margins (Tr. 30:7-21, 253:21-254:7).  The Kleinmans and Hettinger discussed this information over the phone and by e-mail; Hettinger revised

his projections based on input from the Kleinmans (Tr. 447:13-448:7).

27.   In mid-December 2007, the Kleinmans asked Hettinger if he wanted to invest in their new business (Tr. 33:17-25).  In an e-mail to the Kleinmans dated January 14, 2008, Hettinger stated that he would be "willing to invest as an equity partner" if the business could "line up the balance of the million in financing it looks like we will need," and that otherwise "we won't make it past probably August of 08" (PX 10). According to Hettinger, the $1 million referenced in the e-mail was in addition to existing commitments of $250,000 from the Kleinmans, $50,000 from Thierry Wizman, Reid Kleinman's brother-in-law and $200,000 from Hettinger (Tr. 35:12-36:23, 271:16-17, 272:25-273:3).  In an e-mail to the Kleinmans on the same day, he attached financial projections and states that it "[l]ooks like we could barely squeeze by with $1.5 million in equity if had no safety net" (PX 11).

28.   By January 20, 2008, Hettinger had solicited his father, father-in-law, brother and two other individuals to invest in the business and had approached PNC bank about potential financing (Tr. 173:17-174:15).

29.   Hettinger also testified that at the beginning of January the Kleinmans informed him that their cousin, Bebert

Azran, would contribute $500,000 in equity and would probably invest another $250-300,000 in the business (Tr. 37:22-38:14).

30.   On January 17, 2008, the Kleinmans had a meeting with Merchants Factors about financing the new business.  After the meeting, the Kleinmans called Hettinger, and Reid Kleinman reported to Hettinger that Azran committed to making an equity investment of $1 million dollars, $500,000 of which would be held by Merchants Factors as collateral for financing the business[2], in exchange for sixteen percent of shares; according to Reid Kleinman, Azran had signed a personal guarantee, as well as given Merchants Factors a lien against five of his companies as security for the loans (Tr. 42:17-43:14, 44:1-5).  He also told Hettinger that the Kleinmans had both signed personal guarantees secured by their homes (Tr. 43:2-7).  Hettinger communicated this information to his father in an e-mail of the same date, and then forwarded the same e-mail to the Kleinmans, stating, "Please look this over and let me know if I mis-stated anything?" (PX 12).

31.   In fact, Azran never committed to putting one million dollars into Alpha Beauty Distributors (Tr. 290:6-7).

_____

[2]According to Hettinger, Reid Kleinman told him that Merchants Factors required $500,000 in collateral in order to finance purchase orders, inventory, and accounts receivable (Tr. 42:19-43:1).  According to Hettinger's January 17, 2008 e-mail, the $500,000 was required in order to take out a line of credit from Merchants Factors (PX 12).  None of the parties explained why Alpha Beauty Distributors would have to deposit cash collateral with Merchants Factors in exchange for the privilege of borrowing additional money.

Rather, he and Wizman together agreed to lend $250,000 to Alpha Beauty Distributors, $200,000 of which was to be retained by Merchants Factors as cash collateral (Tr. 286:6-287:9; PX 13, 77).  In addition, Azran was the principal of only two companies (Tr. 290:10-15, 416:2-18)

32.  Azran testified that in late 2007 he began discussing an investment in Alpha Beauty Distributors with the Kleinmans (Tr. 272:3-274:11).  At one meeting in particular the Kleinmans told Azran that Hettinger was willing to invest $500,000 in the company (Tr. 279:12-24).

33.  The Kleinmans never executed guarantees secured by their homes.  Noel Kleinman's residence was already mortgaged as of January 2008.  Reid Kleinman's apartment was in his wife's name and he lacked the authority to grant a mortgage (Tr. 416:21-417:6).

34.  Nevertheless, According to Hettinger, Reid Kleinman confirmed the facts set forth in Hettinger's January 17 e-mail later that evening, and the Kleinmans never corrected any statement in the e-mail (Tr. 47:25-48:17).

35.  Reid Kleinman testified that he spoke to Hettinger by telephone and corrected the statements in his e-mail "point by point" (Tr. 536:24-537:18).  Noel Kleinman also testified that he informed Hettinger of the e-mail's inaccuracy in a telephone call (Tr. 420:1-7).  In their depositions, however, neither of the

Kleinmans recalled correcting the information in the e-mail (Reid Kleinman Dep. 67:3-6; Noel Kleinman Dep. 78:24-79:5).  I do not credit the Kleinmans' trial testimony on this matter because it is inconsistent with their previous testimony, and no explanation was offered for this inconsistency.

36.  Noel Kleinman's 2007 tax return shows a $69,700 loss from All State Beauty (PX 53).  Noel Kleinman did not disclose this loss to Hettinger prior to Hettiger's investment in Alpha Beauty Distributors (Tr. 438:6-440:4).  Noel Kleinman testified that despite this reported loss, the Kleinmans actually earned $100,000 from Alpha Wholesalers in 2007, but Alpha Wholesalers refused to pay them (Tr. 506:15 - 507:15).  In February, 2008, however, Alpha Beauty Distributors purchased $1,395,462.90 worth of inventory from Alpha Wholesalers (PX 28).  Noel Klainman's explanation for why Alpha Beauty Distributors bought over $1 million in inventory from an entity that refused to pay them $100,000 was unconvincing.  Specifically, he testified that Alpha Wholesalers was the only entity that could supply them with inventory quickly (Tr. 507:16-18).

37.  At some point after January 20th, 2008, the terms of Hettinger's investment in Alpha Beauty Distributors were finalized.  Noel Kleinman, Reid Kleinman, and Robert Alfano would receive twenty percent of shares, Azran would receive sixteen percent of shares, Hettinger would receive twenty percent of

shares as a partner in the business, and an additional 3.2 percent to reflect his $200,000 investment (Tr. 50:20-51:25).

38.  Hettinger was supposed to meet all of the other investors in New York prior to investing in Alpha Beauty Distributors, but this meeting never took place.  Instead, on January 28, 2008, he agreed to make an immediate $200,000 payment because Alpha Beauty Distributors was receiving telephone calls from customers complaining that if they didn't receive money owed to them they would look for another supplier (Tr. 53:9-22).

39.  Along with his $200,000 check, Hettinger enclosed a letter ("Letter Agreement") stating that he was investing "prior to an acceptable 'operating agreement'" for the purpose of paying amounts owed to BI-LO, LLC and Bruno's Supermarkets and that if the parties did not agree on an operating agreement Hettinger's investment would be "returned immediately upon request" with ten percent annual interest.  The Letter Agreement contains a signature line for Noel Kleinman as President of Alpha Beauty Distributors (PX 16).

40.  Hettinger testified that he spoke with Noel Kleinman about the letter both before and after he sent it and that Noel Kleinman expressed agreement with its terms.  He also testified that after he sent the letter, Noel Kleinman told him that he would sign and return it to him, but never did so (Tr.

58:23- 59:12).  The Kleinmans did, however, cash Hettinger's
check (Tr. 59:13-14; PX 17).

41.   The amounts Alpha Beauty Distributors owed to Bi-
LO, LLC and Bruno's Supermarkets were paid (Tr. 411:17-22).

42.   On February 19, 2008, the Kleinmans sent Hettinger
a draft shareholder's agreement (PX 19).  This agreement gave
Hettinger and Azran only eight percent of shares each (PX 19).
Upon receiving this agreement, Hettinger called Noel Kleinman and
informed him that these were not the terms they had discussed
(Tr. 64:16-65:1).  Noel Kleinman replied that adjustments to the
original terms needed to be made (Tr. 65:2-6).  Hettinger
subsequently had his attorney review the agreement, and he
brought fifteen or sixteen issues to Reid Kleinman's attention.
Chief among these issues were inadequate corporate checks and
balances.  In particular, Hettinger wanted Azran or himself to
have access to corporate accounts (Tr. 65:11-65:18, 66:16-24).
The Kleinmans told Hettinger that his proposed changes would be
difficult to implement (Tr. 65:16-20, 66:25-67:5).

43.   Hettinger never received any other drafts of the
shareholder agreement (66:25-67:5).

44.   On May 22, 2008, pursuant to Reid Kleinman's
request on May 8, 2008, Hettinger sent the Kleinmans a list of

his concerns regarding the shareholder agreement (Tr. 88:18-89:18; PX 117[3]).

45. On February 1, 2008, Noel Kleinman sent Hettinger a personal guarantee in favor of Merchants Factors (PX 106). Reid Kleinman informed Hettinger that he had to sign the guarantee in order to become a partner (Tr. 210:17-211:4). Hettinger told the Kleinmans, in an e-mail of the same date, that he would not sign the guarantee because it could subject him to liability for the full amount of debt to Merchants Factors and gave Merchants Factors the power to change the terms of the guarantee at will. He further stated that if Merchants Factors required him to sign the guarantee he wouldn't "be able to be a partner or I guess even an equity investor?" (PX 107).

46. On February 22, 2008, BI-LO, LLC contacted Hettinger seeking payment of Alpha Beauty Distributors' debt to it (PX 39). Hettinger forwarded this e-mail to Reid Kleinman and suggested that he take the necessary funds out of the operating account (Tr. 71:15-16, 72:6-13). Reid Kleinman responded that there was no money in the operating account because Azran had only contributed $500,000 to the business (Tr. 72:14-17). Reid Kleinman stated that Azran would invest the remaining $500,000 soon (Tr. 74:23-75:12).

---

[3]Although the May 22, 2008 e-mail, Plaintiff's Exhibit 117, indicates that there was an attachment entitled "Shareholders Agreement Issues," no such attachment was offered in evidence.

47.   Hettinger attempted to set up a meeting with the
Kleinmans, Alfano and Azran in March 2008 (PX 20).  Noel Kleinman
told him that Azran was unavailable because he was at a trade
show on the west coast (Tr. 73:2-74:13).  Hettinger made a second
attempt to meet with Azran in March 2008 and was again told that
Azran was on the west coast (Tr. 102:7-15).

48.   On April 6, 2008, Hettinger sent an e-mail to the
Kleinmans stating that he no longer wished to invest in Alpha
Beauty Distributors because (1) he felt "too far removed from the
day-to-day details" because he lived in Pittsburgh and the
business was in New Jersey, (2) he had concerns with the
shareholder's agreement, and (3) the Kleinmans had made
inaccurate statements regarding Azran's investment.  He also
stated that he had requested the return of his funds
approximately one month prior and that the "target date" for the
return of his money was April 17, 2008 (PX 21).

49.   On April 23, 2008, Hettinger met with the
Kleinmans in the airport in Birmingham, Alabama after a meeting
with a customer (Tr. 82:1-9).  Noel Kleinman was supposed to
bring the signed Letter Agreement, but instead presented
Hettinger with a loan agreement (Tr. 82:1-25).  The Kleinmans
encouraged Hettinger to sign the agreement and told him that it
was the same agreement they had used for other investors (Tr.
83:18-84:6).  The loan agreement was dated January 8, 2008,

listed Hettinger as the lender, and $200,000 as the loan amount (PX 23).

50.   Hettinger responded that he had made an equity investment and was not interested in loaning money to the Kleinmans (Tr. 83:24-84:1).  He sent an e-mail to that effect later that day which also reiterated his demand for the return of his investment (Tr. 87:13-88:6; PX 24).

51.   Based on the Kleinmans' statement that other investors had signed loan documents, Hettinger e-mailed the Kleinmans a few days later asking if Azran and the other investors had, in fact, made equity investments in Alpha Beauty Distributors (Tr. 84:7-15, PX 24).

52.   After Hettinger sent this e-mail, Reid Kleinman told him that Azran's money was a loan (Tr. 86:16-25).

53.   Alpha Beauty Distributors purchased $1,395,462.90 worth of inventory from Alpha Wholesalers (PX 28).  During discovery, Hettinger created a chart that compared the price Alpha Beauty Distributors paid Alpha Wholesalers for inventory to the price at which Alpha Beauty Distributors could buy the merchandise from other sources and the price at which Alpha Beauty Distributors sold the inventory to retailers (Tr. 116:15-117:11; PX 27).  This chart was created with information from the purchase orders for inventory bought from Alpha Wholesalers (PX 28), a pricing spreadsheet sent from Alpha Beauty Distributors to

BI-LO, LLC (PX 123), as well as purchase orders to vendors other than Alpha Wholesalers (PX 30-36) (Tr. 113:25-120:1).  The chart shows that Alpha Beauty Distributors consistently paid Alpha Wholesalers more -- sometimes as much as 30 or 40 percent more -- than other suppliers were charging and that it consistently sold large amounts of inventory acquired from Alpha Wholesalers at a loss of as much as twenty to forty percent, to BI-LO, LLC (PX 27).

54.  Noel Kleinman testified in his deposition that, beyond the fact that the spreadsheet did not contain information for all of the companies with which Alpha Beauty Distributors did business, he did not disagree with the calculations on the spreadsheet (Noel Kleinman Dep. 405:5-18).  At trial he confirmed this testimony and testified that since that time he had not "generated any document to show that the figures in [the spreadsheet] are incorrect in any way" (Tr. 501:14-21).  Reid Kleinman testified that the spreadsheet did not show all vendors from whom Alpha Beauty Distributors purchased and that some numbers on the spreadsheet were incorrect.  He could not, however, identify any specific number on the spreadsheet as being inaccurate (Tr. 556:19-23, 558:14-19).

55.  Hettinger offered to accompany the Kleinmans when they went to purchase inventory from Alpha Wholesalers in late

18

January or early February of 2008, but was told that his presence
was not necessary (Tr. 251:1-14).

56.   The Kleinmans also paid a number of their personal
expenses with funds from Alpha Beauty Distributors including
personal credit card bills, mortgage payments, a car payment, and
rent (Tr. 466:21-473:22; PX 25,92).   These expenses totaled
$146,593.20.   Reid Kleinman testified at his deposition that
although some of the charges on his American Express cards were
business related, he also charged school tuition and family meals
to the card (Reid Kleinman Dep. 132:16-20, 133:3-134:18).   Reid
paid $134,116.26 into Alpha Beauty Distributor's account (Tr.
480:5-11; PX 41).   Noel Kleinman testified that this left $19,000
after repayment of personal expenses; he could not explain his
basis for that calculation and the correct amount appears to be
$12,476.94 (Tr. 480:12-25).

57.   Although some of these personal expenses are
identified as such in Alpha Beauty Distributors' records (e.g. PX
41), Reid Kleinman concealed a payment of $12,500 to himself.
Alpha Beauty Distributors' general ledger shows a check paid to
Jet Warehouse, where Alpha Beauty Distributors rented space, in
the amount of $12,500 (PX 83).   Jet Warehouse, however, told
Azran that they never received that check (Tr. 313:13-314:7).   In
response to an inquiry by Azran, Reid Kleinman produced a
cancelled check corresponding to the ledger entry and an e-mail

from Wachovia stating that $12,500 was paid to Jet Distribution
(Tr. 314:9-14, 316:15-3:17:3, 568:3-4; PX 83, 85).  Wachovia,
however, produced a check with the same number made out to Reid
Kleinman and endorsed by Reid Kleinman (Tr. 317:4-12; PX 84) and
stated that they never sent or authorized the e-mail he produced
(PX 95, 97).  When asked about these discrepancies, Reid Kleinman
testified that he mistakenly entered the Jet Warehouse check in
the general ledger and that the e-mail he forwarded to Azran
purporting to be from Wachovia was an error by the bank (Tr.
566:24-567:18).

III.  Conclusions of Law and Findings
      of Fact that are Dependent Upon
      the Applicable Principles of Law

      A.  Jurisdiction and
          Applicable Law

      58.  This Court has subject matter jurisdiction under
28 U.S.C. § 1332(a)(1) on the basis of diversity of citizenship.

      59.  Since the Court's subject matter jurisdiction is
predicated on diversity of citizenship, New York's choice of law
rules control the choice of law issues.  Klaxon v. Stentor Elec.
Mfg. Co., 313 U.S. 487, 496-97 (1941); Lazard Freres & Co. v.
Protective Life Ins. Co., 108 F.3d 1531, 1538-39 (2d Cir. 1997).
Because the parties cite the law of different states with respect

to plaintiffs' various claims, I shall conduct a separate choice of law analysis for each claim.

B.  Plaintiffs' Claims

60.  Plaintiffs assert the following claims against defendants:

a.  breach of contract

b.  fraud

c.  negligent misrepresentation

d.  unjust enrichment

e.  accounting

f.  violation of 43 Pa. Cons. Stat. Ann. § 1471-78; N.Y. Lab. Law §§ 191-a-c; and Florida Stat. Ann. § 686.201.

Plaintiffs also seek to hold the Kleinmans personally liable for the actions of Alpha Beauty Distributors based on "alter-ego" and "piercing-the-corporate veil" theories.

61.  Defendants have also asserted a number of putative affirmative defenses which I shall address to the extent necessary.

62.  I shall first address the issue of liability with respect to each of plaintiffs' claims.  I shall then address damages to the extent necessary.

1. <u>Breach of Contract</u>

    a. Independent
       <u>Contractor Agreement</u>

63.  Plaintiffs contend that the Kleinmans breached the Independent Contractor Agreement by failing to pay Hettinger or PDH commissions earned pursuant to the agreement (Plaintiffs' Proposed Findings of Fact and Conclusions of Law, dated March 15, 2010, ("Pls' Post-Trial Mem."), ¶¶ 85-89).

64.  The Independent Contractor Agreement contains a choice-of-law provision stating that it shall be governed by Florida Law (PX 1, ¶ 8(C)).  "New York law is clear in cases involving a contract with an express choice-of-law provision: Absent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction."  <u>Hartford Fire Ins. Co. v.  Hartford Fire v. Orient Overseas Containers Lines (UK) Ltd.</u>, 230 F.3d 549, 556 (2d Cir. 2000), <u>citing Int'l Minerals and Res., S.A. v. Pappas</u>, 96 F.3d 586, 592 (2d Cir. 1996); <u>see</u> <u>Motorola Credit Corp. v. Uzan</u>, 388 F.3d 39, 50 (2d Cir. 2004) ("a choice-of-law clause in a contract will apply to disputes about the existence or validity of that contract").

65.  In this case, there is no allegation that the choice of law provision was procured by fraud or that application of the provision would violate public policy.  Furthermore,

Florida has sufficient contacts with the agreement because one of the signatories was a Florida corporation, and the Kleinmans told Hettinger that the product sold under the agreement would be housed at and shipped from Florida (Tr. 25:14-24).  Therefore, Florida law applies to plaintiffs' contract claim for breach of the Independent Contractor Agreement.

66.  As an initial matter, I note that because PDH was not in existence at the time the Independent Contractor Agreement was signed, it cannot enforce the agreement against any party. Indeed, although PDH is nominally a party to the agreement, it was not formed until June 20, 2008 (Tr. 242:25-243:17).  Under Florida law, "contracts made for a corporation by its promoters prior to its creation are not enforceable by or against the corporation after its organization." Greenfield Vill. v. Thompson, 44 So.2d 679, 683 (Fla. 1950), citing Sumner-May Hardware Co. v. Scally, 66 Fla. 93, 62 So. 900 (1913); Akel v. Dooley, 185 So.2d 491, 492 (Fla. Dist. Ct. App. 1966).  Although there is an exception if the corporation has ratified the agreement, C.& H. Contractors, Inc. v. McKee, 177 So.2d 851, 853 (Fla. Dist. Ct. App. 1965), citing Meyer v. Nator Holding Co., 102 Fla. 689, 136 So. 636 (Fla. 1931), plaintiffs do not argue that PDH ratified the Independent Contractor Agreement.

67.  Rather, by signing the Independent Contractor Agreement on behalf of an entity that had yet to be formed,

23

Hettinger became individually liable on the contract and can also enforce his rights under the contract. In re Berris, No. 08-13940-BKC-AJC, 2009 WL 1139085 at *2 (Bankr. S.D. Fla. Apr. 27, 2009); O'Neill v. The Home Depot U.S.A., Inc., 243 F.R.D. 469, 477 (S.D. Fla. 2006); see Fla. Stat. Ann. § 608.4238.

68.   "For a breach of contract claim, Florida law requires the plaintiff to plead and establish: (1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." Vega v. T-Mobile USA, Inc., 564 F.3d 1256, 1272 (11th Cir. 2009), citing Friedman v. N.Y. Life Ins. Co., 985 So.2d 56, 58 (Fla. Dist. Ct. App. 2008); Beck v. Lazard Freres & Co., LLC, 175 F.3d 913, 914 (11th Cir. 1999), citing Abruzzo v. Haller, 603 So.2d 1338, 1340 (Fla. Dist. Ct. App. 1992).

69.   "To prove the existence of a contract, a plaintiff must plead: (1) offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms." Vega v. T-Mobile USA, Inc., supra, 564 F.3d at 1272 (11th Cir. 2009), citing St. Joe Corp. v. McIver, 875 So.2d 375, 381 (Fla. 2004); see Lockheed Martin Corp. v. Galaxis USA, Ltd., 222 F. Supp. 2d 1315, 1323 (M.D. Fla. 2002), aff'd, 88 F. App'x 389 (11th Cir. 2003), citing Air Prods. and Chems., Inc. v. La. Land Exploration Co., 806 F.2d 1524, 1529 (11th Cir. 1986) ("Under Florida law, the elements of a contract are offer, acceptance, and

24

consideration.").  There is no dispute that the evidence establishes these elements.

70.  The threshold issue disputed by the parties, however, is whether the Kleinmans were parties to the Independent Contractor Agreement.  The Kleinmans contend that they signed the Independent Contractor Agreement on behalf of Alpha Group and so only Alpha Group is bound by its terms (Kleinmans' Post-Trial Mem. at Conclusions of Law ¶¶ 29-30).  As discussed above, however, I find as a fact that they had no authority to sign on behalf of Alpha Group.

71.  Plaintiffs contend that the Kleinmans are individually liable on the contract because they purported to bind an entity, "Alpha Group d/b/a Alpha Beauty, a Florida corporation with offices at 11430 Interchange Circle North, Miramar Florida 33025," that did not exist (Pls' Post-Trial Mem. ¶ 87).  Alpha Group, however, was an existing entity at the time of the transaction.  Plaintiffs implicitly argue that because (1) Alpha Beauty was not registered as fictitious name by Alpha Group and (2) Alpha Group did not have an office at the address listed in the contract, the Kleinmans contracted on behalf of a non-existent entity.

72.  Neither of these factors, however, renders Alpha Group a non-existent corporation.  Under Florida law, a contract is still enforceable not withstanding the fact that a corporate

25

party used an unregistered fictitious name in entering into the contract.  See Worm World, Inc. v. Ironwood Prods., Inc., 917 So.2d 274, 275 (Fla. Dist. Ct. App. 2005), citing Fla. Stat. Ann. § 865.09(9)(b).  With respect to Alpha Group's address, although the address listed in the contract does not appear in Alpha Group's articles of incorporation (PX 2), there is no evidence that Alpha Group did not have an office at that address.  Furthermore, to hold that a party to a contract is non-existent based on an incorrect address would defeat the intention of the parties and cause a forfeiture of contractual rights based on a technicality.  Such a practice not favored by Florida courts. Goodman v. Winn-Dixie Stores, Inc., 240 So.2d 496, 498 (Fla. Dist. Ct. App. 1970), citing, inter alia, Nash Miami Motors v. Bandel, 47 So.2d 701 (Fla. 1950) ("it is the duty of the courts to construe this contract . . . in order to effect its express intention rather than in a manner to constitute a forfeiture which the courts will ordinarily avoid."); see Texas Co. v. Pensacola Maritime Corp., 279 F. 19, 26-27 (5th Cir. 1922) (Florida Law).

73.  Plaintiffs next contend that because the Kleinmans did not have the authority to bind Alpha Group, they are personally liable for breach of the Independent Contractor Agreement.  Under Florida law, an agent who contracts with a third party without authority from his principal may be held

liable to the third party.  *Tedder v. Riggin*, 65 Fla. 153, 158,
61 So. 244, 245 (1913); *Martha A. Gottfried, Inc. v. Amster*, 511
So.2d 595, 598-99 (Fla. Dist. Ct. App. 1987).  The third party's
damages, however, are "measured, not b[y] the contract, but by
the injury resulting from the agent's want of power."  *Tedder v.
Riggin*, *supra*, 65 Fla. at 158, 61 So. at 245; *Martha A.
Gottfried, Inc. v. Amster*, *supra*, 511 So.2d at 598-99; *McKnight
v. Hialeah Race Course, Inc.*, 242 So.2d 478, 480 (Fla. Dist. Ct.
App. 1970); *see* *Margolis v. Andromides* 732 So.2d 507, 509 (Dist
Ct. App. 1999).  Thus, "the measure of recovery is not the
difference between the plaintiff's pecuniary condition if the
representation had been true and his condition under the actual
facts, but rather the difference between what the plaintiff had
before he acted on the representation and what he had afterward.
This represents his actual loss."  *Tedder v. Riggin*, *supra*, 65
Fla. at 158, 61 So. at 245; *Martha A. Gottfried, Inc. v. Amster*,
*supra*, 511 So.2d at 598-99; *Cf.* Restatement (Third) of Agency §
6.10 cmt. b (2006) (stating that the better rule is to award the
benefit of the bargain for breach of the implied warranty of
authority, but acknowledging Florida case law to the contrary).

        74.  Finally, plaintiffs argue that the Kleinmans are
personally liable under the Independent Contractor Agreement
because, by signing on behalf of an entity other than Alpha
Wholesalers, the entity with which they were then associated,

they were unjustly enriching themselves by retaining profits from Hettinger's sales efforts (Plaintiffs' Post-Trial Mem. ¶ 9). Plaintiffs point to no evidence in the record support the proposition that the Kleinmans acted with this intention, and do not cite any legal authority for the proposition that such behavior would render the Kleinmans personally liable under the Independent Contractor Agreement.

75.   The Kleinmans are not, therefore, personally liable under the Independent Contractor Agreement.  Rather, because they signed the Independent Contractor Agreement without authority, they are individually liable to Hettinger for the actual loss he suffered as a result of their breach of their implied warranty of authority.

76.   Furthermore, because I find that the Kleinmans did not contract with Hettinger or PDH to sell merchandise, none of the sales commission statutes asserted by the plaintiffs are applicable here.  These statutes govern only contractual relationships between sales representatives and their principals. See Florida Stat. Ann. § 686.201 ("'Sales representative'" means a person or business which contracts with a principal to solicit orders" ); 43 Pa. Cons. Stat. Ann. § 1471-78 (defining sales representative as "one who contracts with a principal to solicit wholesale orders from retailers . . ."); N.Y. Lab. Law §§ 191-a ("'Principal' means a person or company . . . who . . .

[c]ontracts with a sales representative to solicit orders . .
.").

   b. The Letter
      <u>Agreement</u>

   77.   Plaintiff next contends that the Kleinmans
breached the Letter Agreement that accompanied Hettinger's
$200,000 investment in Alpha Beauty Distributors (Pls' Post-Trial
Mem. ¶ 84).

   78.   The Kleinmans contend that New Jersey law applies
to this aspect of the dispute, while plaintiffs cite New York Law
(Pls' Post-Trial Mem. ¶ 84; Kleinmans' Post-Trial Mem. at
Conclusions of Law ¶ 3).

   79.   In contract cases, in the absence of an express
contractual provision designating the applicable law, New York
courts apply the law of the forum which is the "center of
gravity" or that has the most significant "grouping of contacts."
<u>Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.</u>, 84 N.Y.2d 309,
317, 642 N.E.2d 1065, 1068, 618 N.Y.S.2d 609, 612 (1994); <u>accord</u>
<u>Lazard Freres & Co. v. Protective Life Ins. Co.</u>, <u>supra</u>, 108 F.3d
at 1539.   As explained by the Court of Appeals in <u>Tri-State</u>
<u>Employment Servs., Inc. v. Mountbatten Sur. Co.</u>, 295 F.3d 256,
260-261 (2d Cir. 2002):

           Courts in New York . . . apply a "center of gravity" or
           "grouping of the contacts" approach to choice-of-law
           issues in contract cases.   Under this approach, courts

29

> may consider a variety of significant contacts,
> including the place of contracting, the places of
> negotiation and performance, the location of the
> subject matter, and the domicile or place of business
> of the contracting parties.  See In re Allstate Ins.
> Co. and Stolarz, 81 N.Y.2d 219, 227, 597 N.Y.S.2d 904,
> 613 N.E.2d 936 (1993).  "[T]he traditional choice of
> law factors" -- the places of contracting and
> performance -- are "given heavy weight in [this]
> analysis."  Id. at 226, 597 N.Y.S.2d 904, 613 N.E.2d
> 936 (internal quotation marks omitted).

See also Alderman v. Pan Am World Airways, 169 F.3d 99, 103 (2d

Cir. 1999) ("Under New York's choice-of-law rules, the

interpretation and validity of a contract is governed by the law

of the jurisdiction which is the 'center of gravity' of the

transaction."); Beatie & Osborn LLP v. Patriot Scientific Corp.,

431 F. Supp. 2d 367, 379 (S.D.N.Y. 2006) (Leisure, D.J.) (same);

U.S. Fidelity & Guar. Co. v. Petroleo Brasileiro S.A.-Petrobras,

98 Civ. 3099 (JGK), 2001 WL 300735 at *21 (S.D.N.Y. Mar. 27,

2001) (Koeltl, D.J.) (same).

　　　　80.  In this case, Hettinger contracted with Alpha

Beauty Distributors, a New Jersey corporation with its principal

place of business in New Jersey.  The subject matter of the

contract was an investment in the same New Jersey corporation and

performance of the contract -- the issuance of shares and the

execution of an operating agreement -- presumably would occur

between New Jersey and Pennsylvania.  Although the letter

agreement was sent to New York and the check was deposited in New

York (PX 16, 17), the balance of the center of gravity factors favors application of New Jersey law.

81.   The elements of a breach of contract claim under New Jersey law are "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) . . . the party [making] the claim performed its own contractual obligations." Frederico v. Home Depot, 507 F.3d 188, 203 (3d Cir. 2007), citing Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc., 210 F. Supp. 2d 552, 561 (D.N.J. 2002).

82.   "In New Jersey, the basic elements of a contract are offer, acceptance, and consideration." Carmen v. Metrocities Mortgage, No. 08-2729 (RBK/KMW), 2010 WL 421115 at *6 (D.N.J. Feb. 1, 2010), citing Smith v. SBC Commc'ns Inc., 178 N.J. 265, 283, 839 A.2d 850, 861 (2004).  The Letter Agreement constitutes a valid contract between Hettinger and Alpha Beauty Distributors. Hettinger signed the agreement and, although Noel Kleinman never signed it, Alpha Beauty Distributors manifested its assent to the agreement's terms.  The agreement provides that "[b]y endorsing and depositing this check, you acknowledge and agree to all of the investment requirements stated in this letter above" (PX 16). Under New Jersey law, "where an offeree gives no indication that he or she objects to any of the offer's essential terms and passively accepts the benefits of an offeror's performance, the offeree has impliedly manifested his or her unconditional assent

to the terms of the offer."  <u>Weichert Co. Realtors v. Ryan</u>, 128
N.J. 427, 436-37, 608 A.2d 280, 285 (1992).  Here, the Kleinmans,
as officers of Alpha Beauty Distributors, received the letter,
did not object to its terms, and deposited the check into Alpha
Beauty Distributors' account.  Finally, there is consideration on
both sides of the agreement.  Hettinger invested $200,000 in
Alpha Beauty Distributors in exchange for 3.2 percent of the
shares of Alpha Beauty Distributors, Inc.

  83.  Although Hettinger fully performed under the
Letter Agreement by making the $200,000 investment, Alpha Beauty
Distributors breached its obligations under the Letter Agreement.
Under the terms of the contract, if no agreement was reached on
an operating agreement, Hettinger was entitled to an immediate
return of his investment plus ten percent annual interest (PX
16).  Although the parties never agreed on an operating
agreement, and Hettinger demanded the return of his $200,000 (PX
21), the money was never returned.

  84.  Nevertheless, the Kleinmans contend that Hettinger
is not entitled to recovery under the contract because he
breached the covenant of good faith and fair dealing (Kleinmans'
Post-Trial Mem. at Conclusions of Law ¶ 10-12; Pretrial Order at
9) by insisting on an operating agreement after he decided not to
be a shareholder, by refusing to agree to the terms of the
operating agreement that the Kleinmans proposed, and by failing

to convert his investment into a loan at the Kleinmans'
suggestion.

85.   In Elliot & Frantz, Inc. v. Ingersoll-Rand Co.,
457 F.3d 312, 328-29 (3d Cir. 2006), the Third Circuit
articulated the standard for breach of the covenant of good faith
and fair dealing as interpreted by the courts of New Jersey:

> Under New Jersey law, "[e]very party to a contract
> . . . is bound by a duty of good faith and fair dealing
> in both the performance and enforcement of the
> contract." Brunswick Hills Racquet Club, Inc. v. Route
> 18 Shopping Ctr. Assocs., 182 N.J. 210, 864 A.2d 387,
> 395 (2005). . . .  The implied duty of good faith and
> fair dealing requires that "neither party shall do
> anything which will have the effect of destroying or
> injuring the right of the other party to receive the
> full fruits of the contract." R.J. Gaydos Ins. Agency,
> Inc. [v. Nat'l Consumer Ins. Co., 773 A.2d 1132, 1146,
> 168 N.J. 255 (2001)].
>
> *   *   *
>
> However, "bad motive or intention is essential," to an
> allegation of breach of the covenant of good faith and
> fair dealing and "an allegation of bad faith or unfair
> dealing should not be permitted to be advanced in the
> abstract and absent improper motive." [Wilson v.
> Amerada Hess Corp., 773 A.2d 1121, 1130, 168 N.J. 236,
> 251 (2001)].

See also Cargill Global Trading v. Applied Dev. Co., No. 03-5920
(WHW), 2010 WL 1568457 at *14-*15 (D.N.J. Apr. 21, 2010); Luso
Fuel Inc. v. BP Prods. N. Am., Inc., No. 08-3947 (DMC), 2009 WL
1873583 at *5 (D.N.J. June 29, 2009).

86.   The Kleinmans contend that Hettinger breached the
covenant of good faith and fair dealing by seeking to enforce the
provision of the Letter Agreement that conditioned Hettinger's

investment on a mutually acceptable operating agreement. According to the Kleinmans, Hettinger's decision not to become a shareholder because it would require him to sign a personal guarantee "rendered the condition of an acceptable operating agreement [] moot" (Kleinmans' Post-Trial Mem. at Conclusions of Law ¶ 6) and Hettinger's insistence on an operating agreement after this point was in bad faith.  The condition of an operating agreement, however, was not "moot" regardless of the nature of Hettinger's investment.  Even if Hettinger's money was a loan to Alpha Beauty Distributors, conditioning the advance of $200,000 to the company on an operating agreement that contained corporate checks and balances is reasonable and does not demonstrate any bad motive on Hettinger's part.

　　　　87.  With respect to the negotiation of the operating agreement, Hettinger testified that after receiving the agreement, he called Reid Kleinman and raised fifteen or sixteen issues concerning the operating agreement.  The Kleinmans never responded specifically to Hettinger's comments and Reid Kleinman told him that making his proposed changes would be "difficult." Therefore, if any party refused to negotiate the operating agreement in good faith, it was the Kleinmans, by not substantively responding to Hettinger's suggested changes.

　　　　88.  Finally, Hettinger's refusal to convert his $200,000 equity investment into a loan after the Kleinmans had

not only failed to comply with the terms on which the investment
was conditioned but also misrepresented the amounts that Azran
invested in Alpha Beauty Distributors was a logical, reasonable
business decision and does not demonstrate that Hettinger was
acting in bad faith.

89.  Hettinger was damaged in the amount of the
$200,000, plus interest, that was never returned to him.

90.  The Kleinmans contend that they are not personally
liable under the Letter Agreement because Hettinger invested in
Alpha Beauty Distributors, Hettinger's check was payable to Alpha
Beauty Distributors, and because the agreement contained a
signature line for Noel Kleinman in his representative capacity.
(Kleinmans' Post-Trial Mem. at Findings of Fact ¶ 3).  Plaintiffs
claim that the corporate veil of Alpha Beauty Distributors should
be pierced and the Kleinmans held personally liable under the
Letter Agreement (Pls' Post-Trial Mem. ¶ 89).

91.

In New Jersey, two elements must be shown to pierce the
corporate veil:  "First, there must be such unity of
interest and ownership that the separate personalities
of the corporation and the individual no longer exist.
Second, the circumstances must indicate that adherence
to the fiction of separate corporate existence would
sanction a fraud or promote injustice."  The Mall at IV
Group Properties, LLC v. Roberts, No. 02-4692, 2005 WL
3338369, at *3 (D.N.J. Dec. 8, 2005) (quoting 1 William
Meade Fletcher et al., Fletcher Cyclopedia of the Law
of Private Corporations, § 41.30 (perm.ed.,
rev.vol.1999)). . . In determining whether a unity of
interest and ownership exists under the first prong,

the Third Circuit has applied six non-binding factors
to guide this inquiry:

> [1] gross undercapitalization ... [2] "failure to
> observe corporate formalities, non-payment of
> dividends, [3] the insolvency of the debtor
> corporation at the time, [4] siphoning of funds of
> the corporation by the dominant stockholder, [5]
> non-functioning of other officers or directors,
> absence of corporate records, and [6] the fact
> that the corporation is merely a facade for the
> operations of the dominant stockholder or
> stockholders."

> Craig v. Lake Asbestos of Quebec, Ltd., 843 F.2d 145,
> 150 (3d Cir. 1988) (citations omitted).  With respect
> to the second element, a plaintiff need not prove
> common law fraud but instead demonstrate that the
> defendants, via the corporate form, perpetrated "a
> fraud, injustice, or the like," a less exacting
> standard. Group Properties, 2005 WL 3338369, at *3.

State Capital Title & Abstract Co. v. Pappas Bus. Servs., LLC,
646 F. Supp. 2d 668, 679 (D.N.J. 2009); see Prime Capital Group,
Inc. v. Klein, No. 07-414 (JLL), 2008 WL 2945966 at *8-*9 (D.N.J.
July 29, 2008); The Mall at IV Group Props., LLC v. Roberts, No.
02-4692 (WHW), 2005 WL 3338369 at *3 (D.N.J. Dec. 08, 2005).

92.  The Kleinmans contend that Hettinger does not have
standing to pierce the corporate veil of Alpha Beauty
Distributors because he is not a shareholder (Kleinmans' Post-
Trial Mem. at Conclusions of Law ¶ 40).  New Jersey law does not
limit actions to pierce the corporate veil to shareholders.  See,
e.g., Scholes Elec. & Commc'ns, Inc. v. Fraser, No. 04-3898
(JAP), 2006 WL 1644920 at *7 (D.N.J. June, 14 2006) (creditors);
Beuff Enters. Fla., Inc. v. Villa Pizza, LLC, No. 07-2159 (PGS),

2008 WL 2565008 at *12 (D.N.J. June 25, 2008) (franchisees); <u>John R. Steele & Assocs., Inc. v. Villante</u>, 659 F. Supp. 157, 159 (D.N.J. 1987) (creditor).

      93.  The Kleinmans argue that Alpha Beauty Distributors had its own identity because it had its own records, bank account, creditors, officers and employees and because it rented a warehouse and had over $1 million in sales.  Furthermore, the Kleinmans contend that its failure to hold corporate meetings was excusable because it had only four shareholders (Kleinmans' Post-Trial Mem. at Conclusions of Law ¶ 37).  Nevertheless, I conclude that there was such unity of interest between the Kleinmans and Alpha Beauty Distributors that the corporation had no separate personality.  Based on the projections developed by Hettinger and the Kleinmans, Alpha Beauty Distributors was grossly undercapitalized.  The Kleinmans and Hettinger determined that $1.5 million would be necessary for Alpha Beauty Distributors to survive its first year of operations.  However, at the time of Hettinger's investment, Alpha Beauty Distributors had only $450,000, $250,00 of which consisted of loans from Azran and Wizman.  In addition, the Kleinmans used Alpha Beauty Distributors' funds to pay over $100,000 in personal expenses.  The Kleinmans also paid prices well over market to purchase the inventory of Alpha Wholesalers, an entity in which they held an interest.  Alpha Beauty Distributors also failed to observe

corporate formalities.  It did not have corporate by-laws and never issued stock certificates (Noel Kleinman Dep. 178:16-22, 179:8-10).

94.   Furthermore, allowing the Kleinmans to avoid liability based on use of the corporate form would be unjust.  As explained below, the Kleinmans fraudulently induced Hettinger to invest in Alpha Beauty Distributors by misrepresenting the amounts other investors were putting in to the corporation. Moreover, the Kleinmans' abuse of the corporate form may have prevented the parties from agreeing on an operating agreement. The corporate governance provisions proposed by Hettinger, which included shareholder access to financial records, were likely unappealing to the Kleinmans because they would have prevented them from using corporate funds for personal expenses and paying above market rates to suppliers with which they were associated.

95.   The Kleinmans are, therefore, individually liable for Alpha Beauty Distributors' breach of the Letter Agreement.


2. <u>Fraud</u>

96.   Plaintiffs next contend that the Kleinmans fraudulently induced Hettinger to invest in Alpha Beauty Distributors by making certain misrepresentations with respect to the funding of and prospective business opportunities for Alpha Beauty Distributors (Pls' Post-Trial Mem. ¶¶ 78-83).

38

97.   All parties cite New York law with respect to
their fraud claims, and, thus, impliedly consent to the
application of New York law to this aspect of the dispute.
Golden Pacific Bancorp v. F.D.I.C., 273 F.3d 509, 514 n.4 (2d
Cir. 2001), citing Krumme v. WestPoint Stevens Inc., 238 F.3d
133, 138 (2d Cir. 2000).[4]

98.   Under New York law, a plaintiff claiming fraud
must show that: "(1) the defendant made a material false
representation, (2) the defendant intended to defraud the
plaintiff thereby, (3) the plaintiff reasonably relied upon the
representation, and (4) the plaintiff suffered damage as a result
of such reliance." Wall v. CSX Transp., Inc., 471 F.3d 410, 415-
16 (2d Cir. 2006), citing Bridgestone/Firestone, Inc. v. Recovery
Credit Servs., Inc., 98 F.3d 13, 19 (2d Cir. 1996).

99.   "[U]nder New York law, parallel fraud and contract
claims may be brought only if the plaintiff (1) demonstrates a
legal duty separate from the duty to perform under the contract;
(2) points to a fraudulent misrepresentation that is collateral
or extraneous to the contract; or (3) seeks special damages that

_____

[4]In their pre-trial memorandum of law, the Kleinmans cite
New Jersey law in response to plaintiffs' fraud claims
(Kleinmans' Pre-Trial Mem. at 14). However the elements of fraud
are substantially similar under New York and New Jersey law.  See
Marino v. Marino, 200 N.J. 315, 341, 981 A.2d 855, 871 (2009),
citing Liberty Mut. Ins. Co. v. Land, 186 N.J. 163, 175, 892 A.2d
1240, 1247 (2006); Arcand v. Brother Intern. Corp., 673 F. Supp.
2d 282, 305-06 (D.N.J. 2009); Labus v. Navistar Intern. Transp.
Corp., 740 F. Supp. 1053, 1066 (D.N.J. 1990).  A choice of law
analysis is, therefore, unnecessary.

are unrecoverable as contract damages." Merrill Lynch & Co. Inc.
v. Allegheny Energy, Inc., 500 F.3d 171, 183 (2d Cir. 2007),
citing Bridgestone/Firestone, Inc. v. Recovery Credit Servs.,
Inc., supra, 98 F.3d at 20; GEM Advisors, Inc. v. Corporacion
Sidenor, S.A., 06 Civ. 5693 (RJS), 2009 WL 3459187 at *17
(S.D.N.Y. Oct. 27, 2009) (Sullivan, D.J.); Great Earth Int'l
Franchising Corp. v. Milks Dev., 311 F. Supp. 2d 419, 425
(S.D.N.Y. 2004) (Hellerstein, D.J.).

      100.  The Kleinmans made numerous false representations
to Hettinger.  In a telephone conversation after the January 17
meeting with Merchants Factors, Noel Kleinman told Hettinger that
Azran had committed to making a $1 million equity investment in
Alpha Beauty Distributors, had given Merchants Factors a lien on
five of his companies and had executed a personal guarantee.  The
Kleinmans also told Hettinger that they themselves had executed
personal guarantees secured by their homes.  After Hettinger
repeated these statements in an e-mail to his father and the
Kleinmans, the Kleinmans not only failed to correct any statement
contained in the e-mail, Reid Kleinman confirmed everything in
the e-mail.

      101.  At the time of this conversation, however, Azran
had agreed along with Wizman to make a loan of only $250,000,
$200,000 of which would remain on deposit at Merchants Factors as
cash collateral.  Furthermore, Azran was the principal of only

two companies, and the Kleinmans never executed guarantees secured by their homes.  Noel Kleinman's residence was already mortgaged, and Reid Kleinman himself did not own his residence and could not grant a mortgage.

102.  In addition, the Kleinmans failed to disclose to Hettinger that All State Beauty, the company through which they received compensation from Alpha Wholesalers, actually lost $69,700 in 2007.

103.  The amount of equity invested in Alpha Beauty Distributors, the extent to which other investors had personally guaranteed the business, and the success of the Kleinmans' past sales efforts were all critical information for Hettinger, a potential investor.  See Moy v. Adelphi Institute, Inc., 866 F. Supp. 696, 705-06 (E.D.N.Y. 1994), quoting Congress Fin. Corp. v. John Morrell & Co., 790 F. Supp. 459, 470 (S.D.N.Y. 1992) (Patterson, D.J.) ("The standard for materiality is whether or not 'a reasonable man would attach importance [to the fact misrepresented] in determining his choice of action in the transaction in question.'").  In an e-mail dated January 14, 2008, Hettinger specifically told the Kleinmans that he would be "willing to invest as an equity partner" if the company raised an additional million dollars in financing (PX 10).  Furthermore, Hettinger determined the amount of financing necessary to operate

a successful business based upon the financial information provided by the Kleinmans, including their records of past sales.

104.   The Kleinmans contend that their representations concerning Azran's investment in the business were statements of future intent, and, thus, are not a proper basis for a fraud claim (Kleinmans' Pre-Trial Mem. at 15).  This is not the case. The Kleinmans told Hettinger that Azran had "committed to putting a million dollars of his own money as equity into the company" (Tr. 42:17-19), in truth, Azran had not made such a commitment. Thus, the Kleinmans misrepresented present material facts.

105.   The Kleinmans knew at the time they were communicating this information to Hettinger that all of the information was false and they made the statements for the purpose of inducing Hettinger to invest.  I conclude, therefore, that the Kleinmans acted with the intent to defraud Hettinger. See Fid. Funding of Cal., Inc. v. Reinhold, 79 F. Supp. 2d 110, 119 (E.D.N.Y. 1997) (intent to defraud was "obvious" where "there [was] no other plausible purpose for" defendants' conduct).

106.   Hettinger relied on these representations by investing $200,000 in Alpha Beauty Distributors.  Hettinger specifically indicated that an additional $1 million dollars in financing was a condition of his investment, and he arrived at this figure based upon sales information provided by the

Kleinmans.  Based on the Kleinmans' representations, he assumed this condition had been met.

107.  The Kleinmans argue that Hettinger's reliance was unreasonable because he never contacted Azran to verify that Azran was supporting the business in the manner represented by the Kleinmans.[5]  In effect, the Kleinmans argue that Hettinger acted unreasonably because he believed the lies they told.  To establish reasonable reliance, a plaintiff must show "minimal diligence" or care that "negat[es his] own recklessness." Banque Franco-Hellenique de Commerce Intern. et Maritime, S.A. v. Christophides, 106 F.3d 22, 27 (2d Cir. 1997), citing Royal Am. Managers, Inc. v. IRC Holding Corp., 885 F.2d 1011, 1015-16 (2d Cir. 1989).

> Reasonable reliance entails a duty to investigate the legitimacy of an investment opportunity where "plaintiff was placed on guard or practically faced with the facts." Mallis v. Bankers Trust Co., 615 F.2d 68, 81 (2d Cir.1980), abrogated in part on other grounds by Peltz v. SHB Commodities, 115 F.3d 1082, 1090 (2d Cir. 1997).  Only "[w]hen matters are held to be peculiarly within defendant's knowledge[ ] [is it] said that plaintiff may rely without prosecuting an investigation, as he ha[d] no independent means of ascertaining the truth.  Id. at 80. . . .

---

[5]The Kleinmans state that in Hettinger's correspondence with them -- presumably the e-mails demanding a return of his investment -- he never mentions any misrepresentation other than the misrepresentation of Azran's investment (Kleinmans' Pre-Trial Mem. at 14).  However, this does not preclude Hettinger from raising such misrepresentations in the instant case.  There is no evidence that Hettinger was aware that the Kleinmans' other representations were lies at the time he was corresponding with them.

> [i]f the plaintiff "has the means of knowing, by
> the exercise of ordinary intelligence, the truth,
> or the real quality of the subject of the
> representation, he must make use of those means,
> or he will not be heard to complain that he was
> induced to enter into the transaction by
> misrepresentations."

> [Schlaifer Nance & Co v.] Estate of Warhol, 119 F.3d
> [91, 98 (2d Cir. 1997)](quoting Keywell Corp. v.
> Weinstein, 33 F.3d 159, 164 (2d Cir. 1994); Mallis, 615
> F.2d at 80-81).

Crigger v. Fahnestock and Co., Inc., 443 F.3d 230, 234 (2d Cir.
2006) (internal citations and quotation marks omitted); see Fid.
Funding of Cal., Inc. v. Reinhold, supra, 79 F. Supp. at 121
(E.D.N.Y. 1997), citing Mallis v. Bankers Trust Co., supra, 615
F.2d at 80.

108.  As an initial matter, the information concerning
the Kleinmans' sales figures, personal investments and personal
guarantees was peculiarly within the Kleinmans' knowledge, and,
therefore, Hettinger was not obligated to independently
investigate these statements and could not have done so.

109.  The representations about Azran's equity
contributions and collateral admittedly could have been verified
only by contacting Azran directly.  However, this was not a
situation in which Hettinger was "placed on guard or practically
faced with the facts."  He had been doing business with the
Kleinmans for over ten years and had no reason to doubt their
honesty.  Moreover, he was understandably reluctant to contact
Azran -- the Kleinmans' own cousin -- to verify the information

44

about his investment (Tr. 223:7-14).  Asking Azran if his cousins
were telling the truth could have been taken by Azran as an
insult.  Hettinger forwarded an e-mail to the Kleinmans
specifically asking them if all of the relevant information was
correct and never received any correction.  Under the
circumstances, Hettinger exercised the minimal diligence
necessary to establish reasonable reliance.

110.  Citing Treacy v. Simmons, 89 Civ. 7052 (JFK),
1991 WL 67474 (S.D.N.Y. Apr. 23, 1991) (Keenan, D.J.), the
Kleinmans also argue that Hettinger's investment in Alpha Beauty
Distributors was reckless and, thus, he did not reasonably rely
on their misrepresentations (Kleinmans' Post-trial Mem. at
Conclusions of Law ¶ 24).  According to the Kleinmans,
Hettinger's investment was reckless because, although he had
projected that the business needed an additional million in
financing to survive, only half of Azran's $1 million investment
would be available to Alpha Beauty Distributors as the other half
would remain with Merchants Factors as collateral.  In Treacy,
Judge Keenan found that an investor acted recklessly by failing
to read cautionary statements contained in the companies'
offering documents and, thus, could not show reasonable reliance
on defendants' statements concerning the risks of investment in
the company.  Treacy v. Simmons, supra, 1991 WL 67474 at *6.  In
this case, however, there were no offering documents setting

forth cautionary statements that the Kleinmans were or might be liars or that their statements may not be truthful ans should not be relied upon.  Moreover, the fact that Hettinger invested when he believed that the business had $1 million, rather than $1.5 million, in equity investment, does not mean that he did not rely on the Kleinmans' statements.  If Hettinger had known the truth, that he was the only equity investor in Alpha Beauty Distributors, he would not have invested in the new business.

111.  Hettinger was damaged as a result of the Kleinmans' fraud.  Absent their misrepresentations, he would not have invested $200,000 into an entity which, based on undercapitalization and poor sales prospects, was likely to fail. He received nothing -- not even worthless stock -- in return for his money.

112.  Finally, plaintiffs' fraud claim is not duplicative of their breach of contract claim because the misrepresentation pertains to circumstances collateral to the contract.  A representation is collateral to a contract when it pertains to present facts and not "promissory statement[s] of what will be done in the future."  See Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., supra, 500 F.3d at 184, citing Stewart v. Jackson & Nash, 976 F.2d 86, 88-89 (2d Cir. 1992).  In this case, the Kleinmans' representations about financing for Alpha Beauty Distributors and their past sales pertained to present

facts.  Therefore, parallel fraud and contract claims may be brought in this action.

### 3.  Unjust Enrichment

113.  With respect to their unjust enrichment claim, plaintiffs' post-trial and pre-trial memoranda merely state that "[p]rinciples of unjust enrichment require the Kleinmans to account to plaintiffs for all amounts due" (Pls' Pre-Trial Mem. at 14; Pls' Post-Trial Mem. ¶ 90).[6]

---

[6]In the pretrial order, plaintiffs' claim for unjust enrichment is raised only in connection with Hettinger's investment in Alpha Beauty Distributors.  Although "[i]t is an established procedural principle that a party's failure to include a legal theory or defense in the pre-trial order results in its subsequent abandonment or waiver," Kozera v. Int'l Bhd. of Elec. Workers, AFL-CIO, 230 F. Supp. 2d 413, 416 (S.D.N.Y. 2002) (Berman, D.J.), I deem the pretrial order amended based on both parties' post-trial submissions.  Plaintiffs' post-trial submission seeks unjust enrichment with respect to "all amounts due" and the Kleinmans' post-trial submission discusses unjust enrichment in connection with the Independent Contractor Agreement.  See Christoforou v. Cadman Plaza N., Inc., 04 Civ. 08403 (KMW), 2009 WL 723003 at *5 (S.D.N.Y. Mar. 19, 2009) (Wood, D.J.), citing Luria Bros. & Co. v. Alliance Assurance Co., 780 F.2d 1082, 1089 (2d Cir. 1986) and Isik Jewelry v. Mars Media, Inc., 418 F. Supp. 2d 112, 131 (E.D.N.Y. 2005) ("Consent to try claims may be implied when an issue not raised in the pleadings is either addressed in an ongoing way by all parties prior to trial, or is introduced at trial without objection by the opposing party"); see also Fed.R.Civ.P. 15(b).

a.   Independent
Contractor Agreement

114.   Plaintiffs cite New York law (Pls' Post-Trial
Mem. ¶ 90) and the Kleinmans cite both New Jersey and Florida Law
(Kleinmans' Pre-Trial Mem. at 2, Kleinmans' Post-Trial Mem. at
Conclusions of Law ¶ 33) with respect to plaintiffs' unjust
enrichment claim.   Although the choice of law clause in the
Independent Contractor Agreement specifies Florida law,
"extra-contractual claims 'are outside the scope of contractual
choice-of-law provisions[.]'"   Comprehensive Habilitation Servs.,
Inc. v. Commerce Funding Corp., 05 Civ. 9640 (PKL), 2009 WL
935665 at *10 (S.D.N.Y. Apr. 7, 2009) (Leisure, D.J.), quoting
Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc., 414
F.3d 325, 335 (2d Cir. 2005).

115.   In determining the law applicable to unjust
enrichment claims, New York courts determine which jurisdiction
has the most significant contacts with the agreement in question.
In re Grand Theft Auto Video Game Consumer Litig., 251 F.R.D.
139, 148-49 (S.D.N.Y. 2008) (Kram, D.J.); Zoll v. Ruder Finn,
Inc., 02 Civ. 3652 (CSH), 01 Civ. 1339 (CSH), 2004 WL 42260 at *4
(S.D.N.Y. 2004) (Haight, D.J.); Khreativity Unlimited v. Mattel,
Inc., 101 F. Supp. 2d 177, 183 (S.D.N.Y. 2000) (Scheindlin,
D.J.).   As discussed above, among the contacts considered are,
"the place of contracting, the places of negotiation and

performance, the location of the subject matter, and the domicile
or place of business of the contracting parties." Employment
Servs., Inc. v. Mountbatten Sur. Co., supra, 295 F.3d at 260-261,
citing In re Allstate Ins. Co. & Stolarz, 81 N.Y.2d at 227, 597
N.Y.S.2d 904, 613 N.E.2d 936.  Furthermore, "the places of
contracting and performance" weigh heavily in the choice of law
determination.  Employment Servs., Inc. v. Mountbatten Sur. Co.,
supra, 295 F.3d at 260-261, citing In re Allstate Ins. Co. &
Stolarz, 81 N.Y.2d at 227, 597 N.Y.S.2d 904, 613 N.E.2d 936.

116.  New York law has the most significant contacts
with this dispute and its law should be applied.  Although some
of Hettinger's sales efforts inured to the benefit of a New
Jersey corporation, this corporation was not formed until
approximately six months after his sales efforts began.
Furthermore, the New Jersey corporation was so dominated by the
Kleinmans, citizens of New York, that the protection of the
corporate form is not available to the Kleinmans for the reasons
set forth above.  In addition, the agreement was negotiated, in
part, in New York (Tr. 16:10-24).  Although Hettinger is a
citizen of Pennsylvania, claims to have performed his duties as a
salesman primarily in Pennsylvania (Tr. 123:13-16), and received
partial payment under the agreement in Pennsylvania (Tr. 90:3-6),
neither party argues that Pennsylvania law should apply to
plaintiffs' unjust enrichment claim.

117.   "Cases dealing with unjust enrichment in New York are uniform in their recognition of three elements of the claim: 'To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution.'"   Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J. Inc., 448 F.3d 573, 586 (2d Cir. 2006), quoting Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000); Briarpatch Ltd., L.P v. Phoenix Pictures, Inc., 373 F.3d 296, 306 (2d Cir. 2004).

118.   Hettinger acted as a sales agent for Alpha Wholesalers from July 2007 until January 2008 and for Alpha Beauty Distributors from January until June 2008.  In this role, he assisted in generating over $1 million in sales for the two businesses in a line of work in which the Kleinmans lost almost $70,000 the previous year.  Restitution for these sales efforts is equitable because absent such a remedy, the Kleinmans will benefit from contracting on behalf of a corporation which they had no authority to bind and Hettinger will not be compensated for his efforts.

119.   The Kleinmans contend that Hettinger cannot prevail on his unjust enrichment theory against them because they did not personally benefit from his sales efforts.  Because plaintiffs do not allege that the corporate veil should be

pierced with respect to Alpha Wholesalers, there is no basis to conclude that Hettinger's sales efforts on behalf of Alpha Wholesalers conferred a personal benefit on the Kleinmans. Hettinger cannot, therefore, recover from the Kleinmans under an unjust enrichment theory for his sales efforts on behalf of Alpha Wholesalers.

120.  With respect to Alpha Beauty Distributors, however, the Kleinmans cannot successfully argue that they did not personally benefit from Hettinger's services because as discussed above, the corporate veil of Alpha Beauty Distributors should be pierced.

121.  The Kleinmans contend that the doctrine of unjust enrichment is inapplicable because there is a binding agreement covering the matters at issue (Kleinmans' Pre-Trial Mem. at 2-3). Because unjust enrichment is a quasi-contractual remedy, a claim for unjust enrichment will not lie "where there is a valid and enforceable written contract governing the subject matter of the dispute." Kottler v. Deutsche Bank AG, 607 F. Supp. 2d 447, 467 (S.D.N.Y. 2009) (Crotty, D.J.), citing Valley Juice Ltd. v. Evian Waters of France, Inc., 87 F.3d 604, 610 (2d Cir. 1996); see Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., supra, 448 F.3d at 586-87; Nat'l Util. Serv., Inc. v. Tiffany & Co., 07 Civ. 3345 (RJS), 2009 WL 755292 at *9 (S.D.N.Y. Mar. 20, 2009) (Sullivan, D.J.).

122.  There was no binding agreement, however, with respect to Hettinger's role as a sales agent.  Alpha Group was not bound by the Independent Contractor Agreement because the Kleinmans did not have authority to enter into contracts on their behalf.  Furthermore, Alpha Group did not take any action to ratify the contract or to confirm to Hettinger that the Kleinmans had authority to enter the agreement.  2 Florida Jurisprudence: Agency and Employment § 105 (2d ed. 2005) ("Generally, a principal is not liable for or bound by acts or contracts of the agent that are not within the scope of the actual or apparent authority of the agent"); Florida Dairies Co. v. Rogers, 119 Fla. 451, 455-56, 161 So. 85, 86-87 (1935) ("It is elementary that a principal is not bound by the acts of his agent when the agent exceeds his authority [unless] the principal conducts his affairs in such a way as to lead third parties to reasonably conclude that his agent is acting within his authority.") (citations omitted).[7]

_____

[7]Plaintiffs argue that the Independent Contractor Agreement binds Alpha Wholesalers and Alpha Beauty Distributors, because the parties intended for the obligations of the Independent Contractor Agreement to "follow the Kleinmans" if they worked with another company (Pls' Post-Trial Mem. ¶ 73).  Although the agreement does provide that should Alpha Group "sell[] the business or take[] it public or merg[e] with another business, the new owners and management will continue to pay [PDH] for services previously rendered, or will offer a prepayment package which recognizes the income loss to PDH," (PX 1 at ¶5(C)), because the Kleinmans' had no authority to sign the Independent Contractor Agreement, this provision does not impose obligations
(continued...)

123.   Finally, the Kleinmans argue that equitable relief is barred by the doctrine of unclean hands because Hettinger breached the covenant of good faith and fair dealing with respect to the Letter Agreement (Kleinmans' Pre-Trial Mem. at 18; Pretrial Order at 9).  As noted in paragraph 84, above, the Kleinmans claim that Hettinger breached the covenant of good faith and fair dealing by insisting on an operating agreement after he decided not to be a shareholder, refusing to agree to the terms of the operating agreement that the Kleinmans proposed, and failing to convert his investment into a loan at the Kleinmans' suggestion.

124.   "[T]he doctrine of unclean hands requires the defendant to prove that (1) the plaintiff is guilty of immoral, unconscionable conduct; (2) the conduct was relied upon by the defendant; and (3) the defendant was injured thereby." Doe v. Deer Mountain Day Camp, Inc., 682 F. Supp. 2d 324, 339 n.31 (S.D.N.Y. 2010) (Pogue, D.J.), citing Nat'l Distillers & Chem. Corp. v. Seyopp Corp., 17 N.Y.2d 12, 15-16, 214 N.E.2d 361, 362, 267 N.Y.S.2d 193, 195 (1966); see Sheehy v. New Century Mortgage Corp., 08-CV-377 (JFB)(MLO), 2010 WL 625331 at *12 (E.D.N.Y. Feb. 19, 2010), citing Kopsidas v. Krokos, 294 A.D.2d 406, 407, 742 N.Y.S.2d 342, 344 (2d Dep't 2002).  In addition, the alleged

---

[7](...continued)
on the Kleinmans, Alpha Group, Alpha Wholesalers, or Alpha Beauty Distributors.

unconscionable conduct must be "directly related to the subject matter in litigation." Mason v. Jamie Music Pub. Co., 658 F. Supp. 2d 571, 588 (S.D.N.Y. 2009) (Jones, D.J.); Stokely-Van Camp, Inc. v. Coca-Cola Co., 646 F. Supp. 2d 510, 533 (S.D.N.Y. 2009) (Koeltl, D.J.) (misconduct must have a "material relation to the equitable relief that plaintiff seeks").

125.  The Kleinmans' allegations of bad faith with respect to the Letter Agreement are, as discussed above, without merit.  Furthermore, these allegations of bad faith cannot not bar equitable relief with respect to Hettinger's sales efforts because they relate only to his role as an investor in Alpha Beauty Distributors and not to his role as a sales agent for Alpha Wholesalers and Alpha Beauty Distributors.

b.  Letter Agreement

126.  Plaintiffs cannot, however, recover for unjust enrichment in connection with Hettinger's investment in Alpha Beauty Distributors.[8]  Here, the Letter Agreement governs Hettinger's investment in Alpha Beauty Distributors and precludes

---

[8]I do not engage in an independent choice of law analysis with respect to this claim for unjust enrichment because there is no difference between the law of the two interested jurisdictions -- New York and New Jersey.  See MK Strategies, LLC v. Ann Taylor Stores Corp., 567 F. Supp. 2d 729, 733-34 (D.N.J. 2008); RCM Tech., Inc. v. Constr. Servs. Assocs., Inc., 149 F. Supp. 2d 109, 114 (D.N.J. 2001), citing In re Penn Central Transp. Co., 831 F.2d 1221, 1230 (3d Cir. 1987).

recovery under an unjust enrichment theory.  See Kottler v.
Deutsche Bank AG, supra, 607 F. Supp. 2d at 467, citing Valley
Juice Ltd. v. Evian Waters of France, Inc., supra, 87 F.3d at 610
(2d Cir. 1996); see Beth Israel Med. Ctr. v. Horizon Blue Cross &
Blue Shield of N.J., Inc., supra, 448 F.3d at 586-87; Nat'l Util.
Serv., Inc. v. Tiffany & Co., supra,, 2009 WL 755292 at *9.

### 4. Accounting

127.  Although plaintiffs do not include a claim for an
accounting in their proposed findings of fact and conclusions of
law, the complaint and the pretrial order contain a claim for an
accounting and the Kleinmans address this claim in their proposed
findings of fact and conclusions of law (Kleinmans' Post-Trial
Mem. at Conclusions of Law ¶ 25).  According to the pretrial
order, this claim arises in connection with plaintiffs' claims
for fraud and breach of the Letter Agreement (Pretrial Order at
3).

128.  Under the law of each of the potentially
interested jurisdictions, an accounting is an equitable remedy
and requires the absence of an adequate remedy at law.  See Am.
United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1071 (11th Cir.
2007), citing Kee v. Nat'l Res. Ins. Co., 918 F.2d 1538, 1540
(11th Cir. 1990); Matsumura v. Benihana Nat. Corp., 06 Civ. 7609
(NRB), 2007 WL 1489758 at *4 (S.D.N.Y. 2007) (Buchwald, D.J.),

citing 300 Broadway Realty Corp. v. Kommit, 235 N.Y.S.2d 205,
206, 37 Misc.2d 325, 325 (Sup. Ct. Albany Cnty. 1962); Beautiful
Jewellers Private Ltd. v. Tiffany & Co., No. 06 Civ. 3085(KMW),
2007 WL 867202, *7 (S.D.N.Y. March 21, 2007) (Wood, D.J.); see
also Newman v. Chase, 70 N.J. 254, 269, 359 A.2d 474, 482 (1976)
(accounting action lies in equity); Atlantic Recording Corp. v.
Pancrazio, No. 06-5572 (RBK), 2007 WL 3036744 at *3 (D.N.J. Oct.
16, 2007), citing Roe v. Operation Rescue, 919 F.2d 857, 868 n.8
(3rd Cir. 1990) (no equity jurisdiction if adequate remedy at
law).  Because Hettinger has an adequate remedy at law through
his claims for fraud and his claim for breach of the Letter
Agreement, he is not entitled to an accounting.

> 5. Negligent
>    Misrepresentation

129.  Similarly, although plaintiffs include a claim
for negligent misrepresentation in the complaint and the pretrial
order, they do not include such a claim in their proposed
findings of fact and conclusions of law.  The Kleinmans argue
that plaintiffs' negligent misrepresentation claim fails because
the evidence does not show justifiable reliance and because there
was no special relationship between the parties (Kleinmans' Pre-
Trial Mem. at 17).

130.  I apply New York law with respect to plaintiffs'
negligent misrepresentation claim because, according to the

pretrial order, it arises from the same set of facts as the fraud claim, to which New York law applies.

131.   As set forth at paragraphs 96 - 112, above, plaintiffs have succeeded in proving their fraud claim, which requires a showing of intentional fraudulent conduct.  Because plaintiffs have proven intentional conduct by the Kleinmans, they cannot recover on their claim for negligent misrepresentation. Among other things, a claim for negligent misrepresentation requires proof that defendant spoke with carelessness.  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 788 (2d Cir. 2003), citing White v. Guarente, 43 N.Y.2d 356, 363, 372 N.E.2d 315, 319, 401 N.Y.S.2d 474, 478 (1977); Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000).  A party's conduct cannot simultaneously be intentional and careless. "[T]he same factual predicate cannot support both a finding of liability based on reckless or intentional conduct and a finding of liability based on negligent conduct . . . ."  Brown v. City of New York, 02 CV 6337 NG LB, 2005 WL 758781 at *4 (E.D.N.Y. Mar. 30, 2005); accord Coggins v. County of Nassau, 07-CV-3624 (JFB)(AKT), 2008 WL 2522501 at *14 (E.D.N.Y. June 20, 2008), aff'd in part, appeal dismissed in part, 362 F. App'x 224 (2d Cir. 2010); see United Nat'l Ins. Co. v. Tunnel, Inc., 988 F.2d 351, 353 (2d Cir. 1993); Glowczenski v. Taser Int'l Inc., CV04-4052 (WDW), 2010 WL 1936200 at *7-*8 (E.D.N.Y. May 13,

2010); <u>Dorn v. Maffei</u>, 386 F. Supp. 2d 479, 486 n.5 (S.D.N.Y. 2005) (Robinson, D.J.); <u>Universal Calvary Church v. City of New York</u>, 96 Civ. 4606 (RPP), 2000 WL 1745048 at *12 (S.D.N.Y. Nov. 28, 2000) (Patterson, D.J.); <u>Martin v. Reliance Ins. Co.</u>, 954 F. Supp. 476, 479 (D. Conn. 1997); <u>People v. Extale</u>, 42 A.D.3d 897, 898, 839 N.Y.S.2d 402, 403 (4th Dep't 2007); <u>Gomez v. Singh</u>, 309 A.D.2d 620, 620-21, 767 N.Y.S.2d 67, 68 (1st Dep't 2003); <u>Dunn v. Brown</u>, 261 A.D.2d 432, 433, 690 N.Y.S.2d 81, 81 (2d Dep't 1999).

132.  Thus, plaintiffs' negligent misrepresentation claim is dismissed.

C.  <u>Damages</u>

1.  Breach of the Independent Contractor
    <u>Agreement and Unjust Enrichment</u>

133.  As discussed above, Hettinger cannot recover against the Kleinmans for breach of the Independent Contractor Agreement because the Kleinmans were not parties to that agreement.  He can, however, recover against the Kleinmans for breach of the implied warranty of authority, which, as discussed above, is measured by his actual loss as a result of the Kleinmans' breach.  <u>See</u> <u>Tedder v. Riggin</u>, <u>supra</u>, 65 Fla. at 158, 61 So. at 245; <u>Martha A. Gottfried, Inc. v. Amster</u>, <u>supra</u>, 511 So.2d at 598-99.  In this case, as a result of the Kleinmans' breach of the implied warranty of authority, Hettinger worked as

a salesperson for Alpha Wholesalers and later Alpha Beauty
Distributors from July 2007 to June 2008, assisted in obtaining
over two million dollars in sales for these entities, and
received only $10,000 in compensation.  Beyond Hettinger's
testimony as to lost income and savings as a result of working
solely for the Kleinmans (Tr. 113:6-17) there is no evidence of
other damage resulting from the Kleinmans' conduct, nor do
plaintiffs allege any other damage.  Therefore, the measure of
Hettinger's actual damage is the value of a year of sales efforts
on behalf of Alpha Wholesalers and Alpha Beauty Distributors less
the $10,000 he was paid.

134.  Plaintiffs contend that this loss should be
valued at $50,608.21, which is equal to three percent of the
total sales he assisted in procuring less the $10,000 he has been
paid.  However, this number represents the commissions that would
have been due to him under the contract and not his actual loss.
Plaintiffs have proposed no other method by which his actual
damages should be valued.

135.  Plaintiffs have not provided the court with any
evidence to assist it in valuing Hettinger's services other than
Hettinger's lost commissions.

136.  With respect to plaintiffs' unjust enrichment
claim, Hettinger is entitled to the reasonable value of the
services he provided for the Kleinmans in connection with his

sales on behalf of Alpha Beauty Distributors.  <u>Giordano v.</u>
<u>Thomson</u>, 564 F.3d 163, 170 (2d Cir. 2009).  As discussed above,
plaintiffs established that Hettinger acted as a salesperson for
Alpha Beauty Distributors and that, although he assisted in
procuring $1,193,273.86 in sales for Alpha Beauty Distributors,
he received only $10,000 in compensation.

        137.  The Second Circuit has held that the terms of
unenforceable agreements are inadmissible to determine reasonable
value of services with respect to quantum meruit claims.  <u>Revson</u>
<u>v. Cinque & Cinque, P.C.</u>, 221 F.3d 59, 69 (2d Cir. 2000); <u>Longo</u>
<u>v. Shore & Reich, Ltd.</u>, 25 F.3d 94, 97 (2d Cir. 1994).  Thus,
Plaintiffs have presented insufficient evidence to determine the
measure of damages due in connection with their claims for breach
of the Independent Contractor Agreement and unjust enrichment.
Plaintiffs have, however, produce sufficient evidence to convince
me that these damages are substantial.  The parties are,
therefore, directed to submit additional evidence with respect to
the proper measure of Hettinger's actual loss based on the
Kleinmans' breach of the implied warranty of authority and the
reasonable value of Hettinger's services to the Kleinmans under
an unjust enrichment theory.  <u>See</u> <u>Shred-It USA, Inc. v. Mobile</u>
<u>Data Shred, Inc.</u>, 228 F. Supp. 2d 455, 462-63 (S.D.N.Y. 2002)
(Marrero, D.J.), <u>aff'd</u> 92 F. App'x 812 (2d Cir. 2004) (ordering
parties to present additional evidence where plaintiff did not

prove the amount of damages by a preponderance of the evidence); see also Nat'l Papaya Co. v. Domain Indus., Inc., 592 F.2d 813, 826 (5th Cir. 1979) (where it was evident that plaintiff suffered substantial damage, but proof of such damage at trial was deficient, a proper course would have been to allow plaintiff to present additional evidence); cf. Sequa Corp. v. GBJ Corp., 156 F.3d 136, 144 (2d Cir. 1998) (denial of motion to re-open the record was improper "where the district court adopted, after trial, a contractual interpretation advocated and anticipated by neither party that, in turn, directed that the calculation of actual damages incorporate a financial element as to which no evidence had been introduced at trial").

> 2.   Fraud and Breach
>      of the Letter Agreement

138.  Plaintiffs' claims for fraud and breach of the Letter Agreement both seek the return of Hettinger's $200,000 investment in Alpha Beauty Distributors.  "A plaintiff seeking compensation for the same injury under different legal theories is of course only entitled to one recovery."  Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 487 (2d Cir. 1995), citing Wickham Contracting Co. v. Bd. of Educ., 715 F.2d 21, 28 (2d Cir. 1983); accord Bender v. City of New York, 78 F.3d 787, 793 (2d Cir. 1996); Conway v. Icahn & Co., Inc., 16 F.3d 504, 511 (2d Cir. 1994); Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 218

(3d Cir. 1992); <u>Hailey v. City of Camden</u>, 650 F. Supp. 2d 349, 357 (D.N.J. 2009).

139.   Under New York law, "Damages [for fraud] are to be calculated to compensate plaintiffs for what they lost because of the fraud, not to compensate them for what they might have gained." <u>See</u> <u>Lama Holding Co. v. Smith Barney Inc.</u>, 88 N.Y.2d 413, 421, 668 N.E.2d 1370, 1373, 646 N.Y.S.2d 76, 80 (1996); <u>accord</u> <u>Reno v. Bull</u>, 226 N.Y. 546, 553, 124 N.E. 144, 146 (1919). The proper measure of damages with respect to Hettinger's fraud claim, therefore, is the $200,000 he invested in Alpha Beauty Distributors.

140.   In breach of contract actions New Jersey courts typically award compensatory damages, the goal of which "is to put the injured party in as good a position as if performance had been rendered." <u>Totaro, Duffy, Cannova and Company, L.L.C. v. Lane, Middleton & Company, L.L.C.</u>, 191 N.J. 1, 13, 921 A.2d 1100, 1107 (2007) (internal quotations and alterations omitted); <u>accord</u> <u>Agathos v. Starlite Motel</u>, 977 F.2d 1500, 1510 (3d Cir. 1992); <u>Furst v. Einstein Moomjy, Inc.</u>, 182 N.J. 1, 13, 860 A.2d 435, 441-42 (2004). The proper measure of damages with respect to Hettinger's breach of contract claim is, thus, $200,000 plus ten percent annual interest from April 8, 2008[9] because under the

_____

[9]April 8, 2008 is the date from which plaintiffs claim interest should run.  Defendants take no issue with the

(continued...)

terms of the Letter Agreement, Alpha Beauty Distributors was required to return Hettinger's investment with ten percent annual interest if the parties did not agree on an acceptable operating agreement.

141.   The proper measure of damages, therefore, for plaintiff's claims for fraud and breach of the letter agreement is $200,000 plus ten percent annual interest[10] from April 8, 2008 because that number represents greater measure of damages between these theories.   See Ostano Commerzanstalt v. Telewide Sys., Inc., 880 F.2d 642, 649 (2d Cir. 1989); Nagoya Venture Ltd. v. Bacopulos, 96 Civ. 9317 (DLC), 1999 WL 311918 at *3 (S.D.N.Y. 1999) (Cote, D.J.).

---

[9](...continued)
appropriateness of this date.   Furthermore, although the damage calculation in plaintiffs' proposed conclusions of law does not include ten percent interest, such interest is requested in the complaint and is the proper measure of damages as it is specifically provided for in the contract.

[10]Although plaintiffs seek prejudgment interest from the date this action was commenced, any additional award of pre-judgment interest would not be equitable in this case.   Hettinger is entitled to ten percent annual interest on his $200,000 investment pursuant to the Letter Agreement and has, thus, already been compensated for the Kleinmans' delay in returning his $200,000.   McAdam v. Dean Witter Reynolds, Inc., 896 F.2d 750, 773 (3d Cir. 1990) ("the court in contract actions must consider whether the equities involved in the case support an award of prejudgment interest"); Moran v. Davita, Inc., No. 06-5620 (JAP), 2010 WL 760516 at *7 (D.N.J. Mar. 4, 2010) ("The purpose of a pre-judgment interest award is to indemnify the non-breaching party for the loss of monies that would have been earned but for the delay in payment.").

### 3. Attorney's Fees

142.   Plaintiffs seek Attorney's Fees pursuant to 43 Pa. Cons. Stat. Ann. § 1471-78 and Florida Stat. Ann. § 686.201. As discussed in paragraph 76 above, these statutes do not apply in this case.

143.   Although plaintiffs' complaint seeks fees and costs in connection with all of his claims, he provides no legal basis on which to depart from the general rule that each party to a litigation bears its own attorney's fees and disbursements, nor is one evident from his submissions.  Plaintiffs' application for fees is, therefore, denied.

### 4. Punitive Damages

144.   Plaintiffs' complaint seeks punitive damages with respect to the fraud claim and the claim to pierce the corporate veil of Alpha Beauty Distributors.  Under New York law, "punitive damages are not available . . . for the 'ordinary' case of fraud" Smith v. Lightning Bolt Prods., Inc., 861 F.2d 363, 371 (2d Cir. 1988); A I Marine Adjusters, Inc. v. M/V SIRI BHUM, 05 Civ. 7227 (LBS)(THK), 2007 WL 760415 at *8 (S.D.N.Y. Feb. 8, 2007) (Katz, M.J.) (Report & Recommendation); Dollar Rapido, Inc. v. eCHEX Int'l, Inc., 04 CV 3280 (NGG), 2006 WL 985630 at *6 (E.D.N.Y. Apr. 14, 2006).  Rather, punitive damages are appropriate for "gross, wanton, or willful fraud or other morally culpable

conduct." Design Strategy, Inc. v. Davis, 469 F.3d 284, 302 (2d Cir. 2006). The Kleinmans' fraudulent conduct is no more morally reprehensible than the ordinary case of fraud, and, therefore, punitive damages are not appropriate. See Shanahan v. Vallat, 03 Civ. 3496 (MBM), 2004 WL 2937805 at *12 (S.D.N.Y. Dec. 19, 2004) (Mukasey, D.J.) (punitive damages not appropriate where defendant showed no "greater moral culpability than is involved in an 'ordinary' fraud case.").

145.  With respect to plaintiffs' claim to pierce the corporate veil of Alpha Beauty Distributors, plaintiffs do not cite any New Jersey case supporting an award of punitive damages for such a claim. Indeed, under New Jersey law, piercing the corporate veil is a "tool of equity" used "to prevent the corporate identity from being used to execute fraud or injustice." Mitsui O.S.K. Lines v. Continental Shipping Line, Inc., No. 04-2278 (SDW), 2007 WL 1959250 at *4 (D.N.J. June 29, 2007); see Board of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164, 171 (3d Cir. 2002).

146.  In this case, the corporate veil was pierced in order to hold the Kleinmans liable for breach of the Letter Agreement. "Under New Jersey law breaches of contract, even if intentionally committed, do not warrant an award of punitive damages in the absence of a showing that defendant also breached a duty independent of that created by the contract." Lightning

65

Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1194 (3d Cir. 1993),
citing W.A. Wright, Inc. v. KDI Sylvan Pools, Inc., 746 F.2d 215,
217 (3d Cir. 1984); See Naporano Iron & Metal Co. v. Am. Crane
Corp., 79 F. Supp. 2d 494, 512-13 (D.N.J. 1999).  Accordingly,
punitive damages are not recoverable on plaintiffs' claim to
pierce the corporate veil to hold the Kleinmans personally liable
on the breach of contract and unjust enrichment claims.

     5.   Consequential Damages

     147.  Plaintiffs' complaint similarly seeks
consequential damages in connection with the breach of contract,
unjust enrichment, accounting and negligent misrepresentation
claims.  However, nowhere in any of plaintiffs' submissions do
plaintiffs describe the basis for a consequential damages claim.
Moreover, beyond a passing reference to lost salary and savings
by virtue of the Kleinmans' conduct, plaintiffs produced no
evidence at trial of consequential damages suffered because of
the Kleinmans' conduct.

IV.  Conclusion

     148.  Accordingly, for all the foregoing reasons, I
find that the Kleinmans are liable to Hettinger for breach of the
Independent Contractor Agreement to the extent that they breached
an implied warranty of authority to contract on behalf of Alpha

Group. I also find that the Kleinmans were unjustly enriched by Hettinger's sales efforts on behalf of Alpha Beauty Distributors.

149.   I find that Alpha Beauty Distributors breached its obligations to Hettinger under the Letter Agreement and that the corporate veil shall be pierced to impose individual liability on Noel and Reid Kleinman for this breach.  I also find that the Kleinmans are liable to Hettinger for fraud but not for negligent misrepresentation.

150.   I find that Alpha Beauty Distributors is not liable to Hettinger for breach of contract, unjust enrichment, fraud, or negligent misrepresentation.

151.   I find that plaintiffs are not entitled to an accounting or any relief pursuant to 43 Pa. Cons. Stat. Ann. § 1471-78; N.Y. Lab. Law §§ 191-a-c; or Florida Stat. Ann. § 686.201.

152.   I find that defendants are not liable to PDH for breach of contract, unjust enrichment, fraud, or negligent misrepresentation.

153.   The Kleinmans are, therefore, liable to Hettinger for damages totaling $247,050.62.

154.   The Kleinmans are also liable to Hettinger for an amount to be determined based on additional evidence to be submitted with respect to Hettinger's actual loss resulting from the Kleinmans' breach of the implied warranty of authority and

the reasonable value of Hettinger's services to the Kleinmans under an unjust enrichment theory.

Dated:  New York, New York
        August 17, 2010

                            SO ORDERED

                            _____
                            HENRY PITMAN
                            United States Magistrate Judge

Copies transmitted to:

Peter J. Pizzi, Esq.
Connell Foley, LLP
888 7th Avenue
New York City, New York 10106

Stanley R. Goodman, Esq.
Suite 412B
Goodman & Saperstein
100 Garden City Plaza
Garden City, New York 11530

Paul F. Carvelli, Esq.
McCusker, Anselmi, Rosen & Carvelli, P.C.
805 Third Avenue, 12th Floor
New York, New York 10022